1

LINDA GEORGE

2

577 Summit Avenue
Hackensack, NJ 07601

3

Telephone:  (201) 487-5225
Fax: (201) 487-8807

4

lgdefense@yahoo.com
Attorney for Plaintiff

5

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

6

7

SGT. JEFFREY S. SARVER,                          )
                                                              )   Case No.:

8

        Plaintiff,                                        )
                                                              )

9

v                                                              )   **PLAINTIFF'S COMPLAINT AND**
                                                              )   **DEMAND FOR JURY TRIAL**

10

THE HURT LOCKER, LLC, MARK BOAL,    )
KATHRYN BIGELOW, GREG SHAPIRO,   )

11

NICOLAS CHARTIER, TONY MARK,           )
DONALL McCUSKER, SUMMIT                   )

12

ENTERTAINMENT, LLC, VOLTAGE            )
PICTURES, LLC, GROSVENOR PARK           )

13

MEDIA, LP, FIRST LIGHT PRODUCTIONS,  )
INC., KINGSGATE FILMS, INC., and             )

14

PLAYBOY ENTERPRISES, INC., Jointly and  )
Severally,                                                    )

15

                                                              )

16

        Defendants.                                       )
_____ )

17

18

        NOW COMES Plaintiff, SGT. JEFFREY SARVER, by and through his attorney, LINDA

19

GEORGE, and for his Complaint against the above-named Defendants, states as follows:

20

21

22

23

24

25

26

27

28

1

**JURISDICTION AND VENUE**

1.      Plaintiff SGT. JEFFREY SARVER (hereinafter "Plaintiff) is a resident of the city of Clarksville, state of Tennessee, and has been since August of 2009.

2.      At all times relevant, Plaintiff was a resident of the city of Dover, State of New Jersey.

3.      At all times relevant, Defendant THE HURT LOCKER, LLC (hereinafter "HURT LOCKER"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, and conducting business in the state of California.

4.      At all times relevant, Defendant MARK D. BOAL (hereinafter "BOAL") was and is a citizen and resident of the city of New York, county of New York, state of New York, and conducting business in the state of California.

5.      At all times relevant, Defendant KATHRYN BIGELOW (hereinafter "BIGELOW"), was and is a citizen and resident of the state of California, conducting business in the state of California.

6.      At all times relevant, Defendant GREG SHAPIRO (hereinafter "SHAPIRO") was and is a citizen and resident of the state of California, conducting business in the state of California.

7.      At all times relevant, Defendant NICOLAS CHARTIER (hereinafter "CHARTIER") was and is a resident of the state of California, conducting business in the state of California, serving as the registered agent for Defendants HURT LOCKER and VOLTAGE PICTURES, and the current CEO of Defendant VOLTAGE PICTURES.

8.      At all times relevant, Defendant TONY MARK (hereinafter "MARK"), was and is a resident of the state of California, conducting business in the state of California.

2

9.     At all time relevant, Defendant DONALL McCUSKER (hereinafter "McCUSKER"), was and is a resident of the state of California, conducting business in the state of California.

10.     At all times relevant, Defendant SUMMIT ENTERTAINMENT, LLC (hereinafter "SUMMIT ENTERTAINMENT"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Universal City, state of California, and conducting business in the state of California.

11.     At all times relevant, Defendant VOLTAGE PICTURES, LLC (hereinafter "VOLTAGE PICTURES"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Los Angeles, California, and conducting business in the state of California.

12.     At all time relevant, Defendant GROSVENOR PARK MEDIA, LP (hereinafter "GROSVENOR PARK MEDIA"), was and is a California Limited Partnership, having its principal office and headquarters in the city of Santa Monica, California, and conducting business in the state of California.

13.     At all times relevant, Defendant FIRST LIGHT PRODUCTIONS, INC. (hereinafter "FIRST LIGHT PRODUCTIONS"), was and is a California Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, conducting business in the state of California.

14.     At all times relevant, Defendant KINGSGATE FILMS, INC. (hereinafter "KINGSGATE FILMS"), was and is a California Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, conducting business in the state of California.

3

15.     At all times relevant, Defendant PLAYBOY ENTERPRISES, INC. (hereinafter "PLAYBOY"), was and is an Illinois corporation, having its principal office and headquarters in the city of Chicago, state of Illinois, and conducting business in the state of California.

16.     There is complete diversity of citizenship between the Plaintiff and the Defendants, and the matter in controversy well exceeds, exclusive of interest and costs, the jurisdictional sum of $75,000.00.  Therefore, this court has subject matter jurisdiction over this action pursuant to 28 USC § 1332(a).

17.     This court may exercise personal jurisdiction over the Defendants because Defendants have written, released, and distributed, the major motion film and DVD, "The Hurt Locker", to various movie theatres and retail stores located throughout the country, including such movie theaters and retail stores located in the state of New Jersey, and including those counties comprising the New Jersey District of this Federal United States District Court.

**GENERAL ALLEGATIONS**

18.     Plaintiff hereby restates and re-alleges paragraphs one (1) through seventeen (17) of this Complaint as if fully stated herein.

19.     At all times relevant, the individual Defendants, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, and McCUSKER, were employees and/or actual, implied, and / or express agents of Defendants HURT LOCKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or KINGSGATE FILMS, and at all times were acting within the course and scope of said employment / agency relationship, thereby rendering Defendants HURT LOCKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or

4

KINGSGATE FILMS, vicariously liable for said individual Defendants' actions and omissions, as set forth below, under the doctrine of *respondent superior.*

20.    At all times relevant, the individual Defendant BOAL was an employee and/or actual, implied, and / or express agent of Defendant PLAYBOY, and at all times was acting within the course and scope of said employment / agency relationship, thereby rendering Defendant PLAYBOY vicariously liable for said individual Defendant's actions and omissions, as set forth below, under the doctrine of *respondent superior.*

21.    At all times relevant, Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, KINGSGATE FILMS, and/or PLAYBOY, individually and/or through their / its employees / agents, wrote, produced, and/or distributed the motion picture film "The Hurt Locker", which was released and distributed to select theaters in New York and Los Angeles on June 26, 2009,, and then underwent a more widespread release on July 24, 2009.

22.    At all times relevant, Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their / its employees / agents, wrote, produced, and/or distributed the motion picture DVD "The Hurt Locker", which was released and distributed to general public throughout the United States on January 12, 2010.

23.    For the reasons more fully explained below, the production, release, distribution, and publication of the motion picture film "The Hurt Locker", and the motion picture DVD "The Hurt Locker", are hardly the "literary" or "artistic" works of Defendants as the Defendants themselves have proclaimed.  Instead, "The Hurt Locker" motion picture film and DVD are nothing more than

the exploitation of a real life honorable, courageous, and long serving member of our country's armed forces, by greedy multi-billion dollar "entertainment" corporations, which engaged in the very simple - though unconscionable and unlawful – act of plagiarizing the name, likeness, mannerisms, habits, and intimate and personal life story of Plaintiff Staff Sgt. Jeffrey S. Sarver, for the sole commercial purpose of unjustly enriching the Defendants in the amount of multiple millions of dollars.

24.    After unlawfully using Plaintiff's name and likeness – without his consent – to make, produce, and distribute a movie about the Plaintiff personally, Defendants further violated the law by unlawfully invading Plaintiff's privacy and defaming the Plaintiff in several scenes of the movie.

## FACTUAL ALLEGATIONS

25.    Plaintiff hereby restates and re-alleges paragraphs one (1) through twenty-four (24) of this Complaint as if fully stated herein.

26.    Plaintiff has been a member of the United States Army since October 7, 1991, who continues to proudly serve his country as a Master Sergeant.

27.    In 2003, for the purpose of facilitating complete, accurate, and up to date (i.e. virtually instantaneous) coverage and reporting of military combat operations, the United States Department of Defense adopted the "embedded media" policies and procedures.

28.    The embedded media policy was designed to facilitate the timely telling of the factual story of our country's combat related operations, "before others seed the media with disinformation and distortions".

29.    To facilitate the immediate release of factually correct military operations related information, the Department of Defense promulgated the embedded media policy, whereby designated media representatives would be selected for long term, minimally restrictive access to

US forces through "embedding", whereby the media will actually live, work, and travel as part of a military unit for several weeks at a time.

30.     In exchange for the Department of Defense agreeing to provide this unprecedented, up-front access to combat operations, the media agreed to be bound by the "Ground Rules" applicable to embedded media, which were agreed to and signed by the media prior to the embedding.

31.     One of the Ground Rules agreed to by the media restricts the type of information to be released / published by the media.  For example, release / publication of a service member's personal information is specifically limited to the member's name and hometown only, and only on condition the service member has provided consent.

32.     In July of 2004, Plaintiff was a Staff Sergeant of the US Army's 788th Ordnance Company, who was a trained and highly experienced EOD (explosive ordnance disposal) technician.

33.     In July of 2004, orders were received for the 788th Ordnance Company, including Plaintiff, to deploy overseas for a six months of service in Operation Iraqi Freedom II.

34.     The orders further commanded Plaintiff to assemble and lead one of three EOD teams (a/k/a "Bomb Squad" teams) for the 788th while deployed in Iraq.

35.     While deployed in Iraq, the central mission of the 788th EOD teams was to identify, render safe, and dispose of hazardous unexploded conventional munitions, chemical munitions, and improvised explosive devices (hereinafter "IEDs").

36.     During this time, there were only about 150 trained Army EOD techs in Iraq.

37.     Because the war zones were inundated with IEDs, Plaintiff's job as an Army EOD tech in Iraq was very dangerous, such that bomb techs were five times more likely to die in Iraq than all other soldiers in theater.

7

38.     During his deployment, Plaintiff and his EOD team were sent on a significant number of missions, during which Plaintiff and his team successfully disarmed multiple number of IEDs.

39.     In December of 2004, Defendant BOAL, a writer for Playboy Magazine, a publication owned, operated, and circulated by Defendant PLAYBOY, was embedded with Plaintiff's 78[8th] Ordnance Company, which was set up at Camp Victory (formerly Camp Liberty) in Baghdad, Iraq.

40.     Defendant BIGELOW first learned of Defendant BOAL's upcoming embedment, as described above, sometime in 2003.  Prior to Defendant BOAL's embedment in December of 2004, Defendant BIGELOW shared with Defendant BOAL how he could use his media embedment as a vehicle to come up with a "screenplay" for a commercial movie.

41.     Shortly before Defendant BOAL's embedment, Plaintiff and the rest of the 788th's members were advised by their Command of Defendant BOAL's upcoming 30 day embedment, and that service members were to accommodate Defendant BOAL as he was to report on / write about, EOD operations in Iraq, *in general.*

42.     Shortly after Defendant BOAL's embedment with the 788th Company, Defendant BOAL stated, represented to, and assured the Company's service members, including Plaintiff, he was working on a report / story about EOD operations in Iraq, *in general*.

43.     During his embedment with the 788th Company in Iraq, Defendant BOAL essentially exclusively followed and accompanied the Plaintiff and his EOD team during the 30 day embedment period, including accompanying Plaintiff while on various different EOD missions and assignments, as well as accompanying Plaintiff after operations when Plaintiff retired for his shift back at the camp.

44. Throughout his embedment, Defendant BOAL took multiple photographs, videos, and audios of the Plaintiff and other service members, and again emphasized and assured the service members these were necessary for Defendant's report / article on EOD *in general*.

45. Throughout Defendant BOAL's embedment, Plaintiff and his team fed, sheltered, personally protected, and ensured the personal safety of, Defendant BOAL.

46. During his embedment, Defendant BOAL became acquainted with not only the *general* military operations of the 788th's EOD, but also with Plaintiff's personal information and personal life story by virtue of the questions Defendant BOAL directed to Plaintiff and by virtue of Defendant's ubiquitous presence around the Plaintiff, including the need to even document Plaintiff's personal environment and effects, including Plaintiff's closed off personal bedroom / sleeping area.

47. Defendant BOAL, after hearing Plaintiff use the phrase "the hurt locker" on multiple occasions while leading his team in Iraq, asked Plaintiff what he meant by that phrase. Plaintiff answered the question for Defendant BOAL.

48. That Defendant BOAL *never* advised the 788th Company's service members, including Plaintiff, that he intended to use his government issued embedment for the purpose of exploiting Plaintiff by gathering Plaintiff's personal information, photographing his likeness, videotaping his likeness, mannerisms, and habits, and recording his discussions, which would later be published in the form of a sensational, personal, private, and embarrassing story or movie about the Plaintiff (in which selected parts are even untrue and defamatory).

49. That had Defendant BOAL advised Plaintiff that he was gathering information for the purpose of publishing a story and / or even a movie, based upon the Plaintiff personally, Plaintiff, as well as other service members of the 788th, would have refused to answer or respond to Defendant's questions and other requests for information.

9

50.     Plaintiff's deployment ended in January of 2005.  By this time, Plaintiff honorably and courageously served his country, fellow service members, and Iraqi civilians, by having disarmed more IEDs than any single team since the operations began in Iraq.  Sgt. Sarver was awarded the bronze star for his commitment and service to his country.

51.     Shortly after Plaintiff's return home to Wisconsin, Defendant BOAL started hounding the Command of the 788th Company, asking for a "visit" with the service members in Wisconsin, so he could finish reporting on his "article" by documenting they were now "safely home".

52.     That after Defendant BOAL visited Plaintiff and other service members in Wisconsin in early 2005, Defendants PLAYBOY and BOAL released, in August /September of 2005, an eleven (11) page article which was focused not on EOD *in general*, but the Plaintiff and his personal life[1].

53.     Immediately after receiving a copy of Defendant BOAL's and Defendant PLAYBOY's August / September 2005 article (hereinafter "the Playboy Article") [**Exhibit A** attached hereto], Plaintiff advised Defendants he did not approve of the article because it was about him personally, contained several untruths, and portrayed him in a false light in various different sections.

54.     Plaintiff requested Defendants to refrain from publishing the Playboy Article.

55.     Defendants told Plaintiff the Playboy Article was already published and distributed to retail stores, and therefore there was nothing which they could do.

---

[1] The title alone illustrates the plain and simple fact that the Playboy Article is really a personal article about Plaintiff Jeffrey Sarver – "For Staff Sergeant Jeffrey Sarver … the war in Iraq couldn't get any more personal.  What's it like to be THE MAN IN THE BOMB SUIT".

10

56.   The Playboy Article was released for sale to the general public in September of 2005, in which was documented the following information concerning the Plaintiff[2]:

    a.   Plaintiff's name and *personal* life are the actual title of Defendants' article;

    b.   The title identifies Plaintiff as "the man in the bomb suit";

    c.   The two photos depicting a man in a bomb suit are identified as plaintiff;

    d.   Plaintiff's age & height;

    e.   Plaintiff having grown up in a trailer park in West Virginia;

    f.   Plaintiff's specific pronunciation of words via his "accent" ("West Virginia twang"; "ah-ee-dee" [IED]);

    g.   The identification of Plaintiff's minor's son by name - Jared, who lives with his ex-wife;

    h.   Quoting Plaintiff about his son: "… a hard headed bastard";

    i.   Plaintiff turning off the headset in his bombsuit during a mission;

    j.   Plaintiff's history of bar fights;

    k.   Plaintiff's personal relationship problems with his ex-wife, his son, and proclivity for fathering children out of wedlock;

    l.   Plaintiff's bedroom / sleeping area being decorated with a map of Iraq;

    m.   Plaintiff's collection of bomb remnants which was kept in a box under his bed;

    n.   Plaintiff stowing away photos of his son, unwilling to show them without being asked;

    o.   Plaintiff's military history including having been a former US Army Ranger;

    p.   Plaintiff's fascination with bombs and deadly explosives;

    q.   Plaintiff being a very successful bomb tech because of an his reckless and flawed character (addicted to war and violence; willing to risk his or anyone else's life simply for "the morbid thrill" or adrenaline rush; being a reckless "wild-man" or "cowboy"; having a twisted fascination and obsession for death and deadly explosive devices; loving war and violence more than his family);

---

[2] Some of which is true, some not.

r.  Drinking alcohol after missions;

s.  Plaintiff's custom / habit of tracking the number of IEDs he disarmed by painting bomb stencils on his humvee;

t.  Being approached by a Colonel after Plaintiff successfully disarmed a very dangerous IED in the Colonel's presence, during which the Colonel asked Plaintiff if he was the crazy man in the bomb suit, then called Plaintiff a hero and asked for a picture;

u.  Plaintiff having abandoned his family (including his son) by choosing to go back to Iraq to continue serving his country;

v.  After giving away Plaintiff's identity, age, height, and speech dialect; after publishing photos of photo both in and out of his bomb suit; after identifying Plaintiff as *the* man in the bomb suit, and knowing Plaintiff was going back to Iraq in the very near future, the article then gratuitously provides there is a $25,000 bounty for the head of any EOD tech;

57.  The Playboy Article (an abridged version) surfaced again when it was republished in the Reader's Digest in 2006.

58.  On June 26, 2009, Defendants initiated the limited released of the motion picture film "The Hurt Locker" in the cities of New York and Los Angeles.

59.  The motion picture film "The Hurt Locker" underwent a more widespread release in the United States on July 24, 2009.

60.  The DVD film "The Hurt Locker", with additional features and materials, underwent a complete nationwide release on January 12, 2010.

61.  At no point in time did *any* Defendant ever so much as even ask Plaintiff for his consent to use his personal story, name, and likeness in a major motion picture.

62.  At no time did Plaintiff ever agree to, consent to, request, or acquiesce in, the making and publication of a movie about himself, his family, or his military activities while in Iraq.

12

63.    Notwithstanding Defendants' disclaimer at the end of the film which states "this is a work of fiction"[3], the movie and the movie's main character "Will James", played by actor Jeremy Renner, is really the Plaintiff, the Plaintiff's name and likeness, and Plaintiff's personal story which were misappropriated by Defendants without Plaintiff's consent.

64.    Plaintiff's colleagues, family members, and friends, easily recognize that the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

65.    Notwithstanding Defendants having changed the name of Jeremy Renner's character from "Sgt Sarver" to "Will James", because of Defendant BOAL's and PLAYBOY's previously published articles, every reader of those articles likewise knows and is led to believe that the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

66.    Any casual reader of the Playboy Article will easily identify the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

67.    An *example[4]* of the movie's portrayal of Plaintiff's likeness and personal information, *some* of which were was documented in the Playboy Article, includes the following:

   a.   The title "The Hurt Locker" – Plaintiff originated this term and said it often around colleagues while in Iraq.  Defendant BOAL took interest in this phrase and asked Plaintiff what the phrase meant. Because Plaintiff was told Defendant BOAL was collecting information for the sake of documenting a factual report about Army EOD *in general*, Plaintiff acquiesced with BOAL's request, which he said often while during his deployment in Iraq;

---

[3] The boilerplate disclaimer further states "The characters and incidents portrayed and the names herein are fictitious, and any similarity to or identification with the name, character, or history of any actual persons living or dead … is entirely coincidental and unintentional."

[4] There are many, many more likenesses of Plaintiff depicted throughout the movie.

b.   "War is a Drug" – Another phrase Plaintiff used when talking to Defendant BOAL;

c.   "Will James", played by Jeremy Renner" – Mr. Renner is essentially the same age and height; to personate Sgt. Sarver, Renner's hair was dyed blonde, and Renner impersonated Sgt. Sarver's persona down to the smallest detail, including the replication of Sgt. Sarver's West Virginia accent, dialect, expressions, mannerisms, personality, and even dress habits (i.e. rolling his sleeves in the exact same manner as Sarver); succinctly stated, Renner acts and behaves just like Plaintiff[5] throughout the movie;

d.   Same Military & Family Background – Just like Plaintiff, character "Will James" is a former Army Ranger who has a young son who lives with his ex-wife back home; Renner is also referenced as a "red neck" and "trailer trash";

e.   Same EOD Missions – Most of the EOD missions depicted in the movie are identical to Plaintiff's, including the same camps where the EOD team was based (ie Camp Victory), and the same manner in which they were handled - as documented in the Playboy Article;

f.   Jeremy Renner sleeping in his bed at night wearing his bomb helmet and underwear;

g.   Jeremy Renner taking a shower while in full army uniform, including the helmet;

h.   Photos of Renner's son discovered in his Renner's bedroom / sleeping area;

i.   Plaintiff's bedroom / sleeping area decorated with a map of Iraq and having a box of collected miscellaneous bomb parts underneath his bed;

j.   Renner referencing his son as a "bastard";

k.   Renner struggles with personal, family relationships just like, and in the same manner as, Plaintiff;

l.   Renner drinking alcohol after successful missions;

m.   Renner setting the record for the most IEDs disarmed by any single soldier;

n.   Like the Playboy Article, Plaintiff is depicted as one who is abnormally fascinated with death, deadly explosives, to the extent that the adrenaline rush he gets from death, killing, and war, is more important to him than his personal relationships, including his children and wife / former wife;

---

[5] During interviews, actor Jeremy Renner admitted the character "Will James" was based upon "one guy [Defendants] knew who was like 'James'". Defendants apparently showed / replicated for, Renner, the habits / mannerisms of Plaintiff in specific situations, and then had Renner replicate those very same actions, and exhibit the same "mentality" as Plaintiff (i.e "that's why I started kicking that trunk [in which was an IED in the movie]". Renner was mimicking Plaintiff, who "literally" kicked IED's, whose actions were taped or recorded by Defendant BOAL during the embedment].

o. Renner is shown leaving his son / family again by enlisting in another deployment to Iraq.

68.   Though the movie clings to the plaintiff's likeness and personal circumstances throughout the movie, Plaintiff is also defamed in placed in a false light in several scenes, such as (1) the scene where Plaintiff explains to his young son that he essentially does not love him, and that the only thing plaintiff loves now is "war".  The movie ends by showing Plaintiff back in Iraq, starting another deployment mission; and (2) the portrayal of Plaintiff as a reckless, gung-ho war addict who has a morbid fascination with death which causes him to carelessly risk both his and his colleagues' lives in the theater of war, simply to feel the thrill of cheating death.

69.   As a direct and proximate result of Defendants' unlawful actions as described above and below, Plaintiff has suffered, and will continue to suffer, significant injuries and damages, both economic and non-economic alike, including, but not limited to, the following:

a. Defendants' unjust enrichment of the value of Plaintiff's name and likeness;

b. Increase risk of harm and/or death to Plaintiff's person caused by Defendants' misappropriating Plaintiff's likeness, and highly publicizing both Plaintiff's likeness and his "perceived" likeness (ie the defamatory / untrue portrayal of him as a mad, foolish, crazy, wild, mentally ill man, who will recklessly risk his and others' lives because of an addiction / fascination with death) – Defendants have essentially placed a bulls-eye on the back of plaintiff's army uniform / bomb suit for any future deployments;

c. Emotional distress and harm (i.e. young soldiers – privates - now cavalierly laugh at Plaintiff as they unabashedly walk up to the highly ranked, Master Sergeant, to ask for his autograph because of his likeness, and involuntary lead role in the film; the fear of whether his peers will now respect / protect him in the theater of war);

d. Injury and damage to Plaintiff's reputation and standing amongst friends, family, and military peers;

e. Loss of earning capacity based upon the injury and harm inflicted against Plaintiff's reputation and standing amongst his friends, family, and military peers;

f. Punitive damages allowed under state and federal law;

g. Any and all other damages otherwise recoverable under state and federal law;

15

**COUNT I**

**RIGHT OF PUBLICITY / MISAPPROPRIATION OF NAME & LIKENESS
ALL DEFENDANTS**

70.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through sixty-eight (69) as if fully set forth herein.

71.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, amounted to an appropriation of plaintiff's name and/or likeness for the Defendants' own use and benefit.

72.     That Defendants' various different uses of Plaintiff's name and/or likeness, was mainly for commercial or trade purposes, without redeeming public interest, news, or historical value[6].

73.     That as a result of Defendants' misappropriation of Plaintiff's likeness, Plaintiff is entitled to the commercial value to Defendants of Plaintiff's likeness, which obviously equates to the revenues thus far earned, and to be earned, in the future by virtue of further movie theater revenues, DVD sales, royalties, and other associated revenues.

74.     That as a direct and proximate result of Defendants' actions and inactions as described above, Plaintiff suffered the injuries and damages as more fully described above.

---

[6] As admitted by Defendant Bigelow during interviews surrounding the Release of the film, the real, primary reason for making *this* movie with *this* story was to simply "sell it".

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.

## COUNT II

### FALSE LIGHT INVASION OF PRIVACY
### ALL DEFENDANTS

75.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through seventy-three (74) as if fully set forth herein.

76.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, throughout various different scenes, depicted Plaintiff in a "false light" in that:

    a.   The depiction of Plaintiff was and is a major misrepresentation of his character, history, activities, and/or beliefs;

    b.   The depiction of Plaintiff was and is highly offensive to a reasonable person; and

    c.   Defendants acted in a reckless disregard as to the falsity of the publicized matter.

77.     That as a direct and proximate result of Defendants' actions and inactions as described above, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.

17

**COUNT III**

**DEFAMATION / DEFAMATION PER SE**
**ALL DEFENDANTS**

78.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through seventy-six (77) as if fully set forth herein.

79.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, throughout various different scenes, contained several false and defamatory statements concerning the Plaintiff, including, but not limited to, the following portrayals / scenes:

    a.  Being portrayed / described as a bad father who did not love his son, who would rather be in the middle of a war confronting the face of death than being with his son;

    b.  Portraying that Plaintiff was embarrassed or ashamed of his son in the scene where photos of Plaintiff's son were found stashed in a hidden in a box, concealed under miscellaneous bomb pieces;

    c.  Being portrayed / described as a "messed up"[7] / "reckless"[8] soldier whose success was attained because Plaintiff had no respect or compassion for human life, who engaged in reckless, uncalculated risks which threatened the lives of Plaintiff and his colleagues;

    d.  Being portrayed as an unstable person who is fascinated with / addicted to the thrill of war and death, who enjoys playing cruel practical jokes on people (ie telling a young child he will chop off his head with a dull knife because he sold him a poor quality DVD, after which he tells the child he is "just kidding"; callously ordering an Iraqi civilian to get inside of a car bomb, after which Plaintiff tells the frightened man "I'm kidding");

---

[7] The words Jimmy Fallon used when describing his thoughts of the character "Will James" during his discussion with Jeremy Renner.

[8] The words Jeremy Renner used when describing "Will James".

e.   Being portrayed / described as a soldier who violates military rules and regulations (i.e. getting drunk after missions; taking off his communication headset during missions);

f.   All foreign and irrelevant communications throughout the movie and DVD.

80.   That these false portrayals rise to the level of defamation, libel, and libel per se, of which Defendants were aware and/or should have been aware.

81.   That as a direct and proximate result of Defendants' actions, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.

**COUNT IV**

**BREACH OF CONTRACT – ALL DEFENDANTS**

82.   Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through eighty (81) as if fully set forth herein.

83.   That Defendants BOAL and PLAYBOY entered into a contract with the United States Department of Defense, whereby Defendants BOAL / PLAYBOY were provided up front access (via embedment with the unit) to the 788th Company's EOD military operations, including access to the service members, including Plaintiff.

84.   In exchange for this up front access via embedment, Defendants BOAL / PLAYBOY agreed to be bound by various Department of Defense rules and restrictions, including the "Ground Rules" applicable to embedded media members.

85.   The ground rules were implemented for the purpose of protecting the health and safety of the military service members, the media representative, and to protect the national security interests of the United States.

19

86.     Plaintiff is thus a 3rd party intended beneficiary under this contract, which entitles him to enforce the contract and to enforce any legal remedies for the breach of said contract.

87.     There was also an express and/or implied contract / agreement between Defendant BOAL / PLAYBOY and Plaintiff, the terms of which included the following:

    a.  Plaintiff agreeing to provide Defendant BOAL / PLAYBOY with:

        i.   food, shelter, personal protection, and safety;
        ii.  an up front seat on all missions participated in and led by Plaintiff;
        iii. Plaintiff's cooperation with Defendant's reporting requests / activities.
    b.  In return, Defendant BOAL / PLAYBOY agreed to:

        i.   comply with the Department of Defense's Ground Rules for embedded media;

        ii.  limit the release of information gathered during the embedment and related reporting activities to an article about EOD military operations *in general*

        iii. Refrain from releasing or publishing specific and/or personal information about the Plaintiff;

        iv.  Refrain from releasing, publishing, or using Plaintiff's name and/or likeness;

88.     The remaining Defendants, by virtue of their agency and / or contractual relationship with Defendants BOAL and PLAYBOY in connection with the production and publication of the Hurt Locker film and DVD, are therefore privies to these contracts and likewise bound by the same terms and provisions.

89.     That one of the provisions of the embedment contract restricts / limits the media to releasing / publishing only the name and hometown of a service member.

90.     That the publication of the Playboy Article and the Hurt Locker film and DVD obviously release / publish much more information about the Plaintiff than just his name and hometown, (to which Plaintiff consented only because he was advised this information would only be used in conjunction with an article about EOD *in general*), and therefore the Defendants have breached its contract entered into the United States Department of Defense.

20

91.     That as a direct and proximate result of Defendants' breach of contract, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.


## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## ALL DEFENDANTS

92.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through ninety (91) as if fully set forth herein.

93.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, amounted to an Intentional Infliction of Emotional Distress, in that Defendants knew both the film and DVD:

    a.  Appropriated Plaintiff's likeness without Plaintiff's consent;

    b.  Contained scenes and material about Plaintiff which would place him at an increased risk of harm or even death during future deployments in a war zone (further inciting enemies to hunt down this high profile bomb squad hero who holds the record for most disarmed enemy IEDs);

    c.  Contained scenes and information about Plaintiff's personal life which would greatly embarrass him and / or his family members;

    d.  Contained scenes and material about the Plaintiff which were utterly false, including:

21

i.   Being portrayed as a father who did not love his son, and who enjoyed being in war in the face of death more than being with his son;

ii.   Being portrayed as a "messed up"[9] soldier whose success was attained only because Plaintiff was foolish and crazy enough to take reckless and uncalculated risks which greatly endangered the lives of Plaintiff and his colleagues;

iii.   Being portrayed as a "weird" and unstable person who is fascinated with / addicted to the thrill of war and death, who enjoys playing cruel practical jokes on people (ie telling a young child he will chop off his head with a dull knife (for selling him a poor quality DVD movie), after which he tells the child he is "just kidding"; callously ordering an Iraqi civilian to get inside of a car bomb, after which Plaintiff tells the frightened man "I'm kidding");

e.   The obvious consequence of portraying Plaintiff - an active military member whose military skills and respect from his peers, commanders, and subordinates, are not only essential to Plaintiff's own military career, but also essential to the continued success of our nation's military operations - in such a negative and untrue light is that Plaintiff will lose the respect he previously enjoyed amongst his colleagues, and Plaintiff will always have to question whether his fellow soldiers will continue to protect him, whether he will be given regular promotions, and whether soldiers will still follow his leadership.

94.   Notwithstanding Defendants' knowledge of the above, Defendants proceeded with the distribution and publication of both the film and DVD versions of "The Hurt Locker", said conduct amounting to extreme and outrageous conduct under the circumstances.

95.   Defendants' actions in publishing both the film and DVD versions of "The Hurt Locker", notwithstanding the above information and knowledge, were and are the proximate cause of Plaintiff's severe emotional distress related to the release of these movies.

96.   Plaintiff's above referenced severe emotional distress is to the extent that no reasonable could be expected to endure the distress which Plaintiff has endured and continues to endure.

---

[9] The words Jimmy Fallon used when describing his thoughts of the character "Will James" during his discussion with Jeremy Renner.

## COUNT VI

### ACTUAL / INTENTIONAL FRAUD
### ALL DEFENDANTS

97.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through ninety-five (96) as if fully set forth herein.

98.     Throughout his embedment with Plaintiff's Army Unit, Defendant BOAL repeatedly represented to the service members, and to Plaintiff in particular, that the purpose of his embedment and reporting activities was to report on the unit's EOD operations, *in general*.

99.     Throughout his embedment, Defendant BOAL never represented he was embedded with Plaintiff's Army Unit for the purpose of flushing out and documenting Plaintiff's personal information, including Plaintiff's name and likeness, photographing and videotaping Plaintiff's name and likeness, or recording Plaintiff's name and likeness, for the ultimate purpose of writing an article or making a major motion film or DVD about the Plaintiff's personal life and likeness.

100.     Unbeknownst to Plaintiff, throughout his embedment with Plaintiff's Army unit, Defendant BOAL was in regular contact with Defendant BIGELOW, conveying to her the information he gathered about the Plaintiff and Plaintiff's experiences.

101.     Unbeknownst to Plaintiff, the Defendants were likely already in the process of writing a "movie" for their own material and commercial gain, made possible only through the Defendants' exploitation and amusement of a soldier who was risking his life on a daily basis in the theater of war, not just for the protection of his country and the Iraqi citizens, but also for the personal protection of the Defendant BOAL.

102.     Even when Defendant BOAL met with Plaintiff and several other soldiers of the 788th in Wisconsin after they arrived home, Defendant BOAL led Plaintiff to believe that

23

Defendant's reporting activities were still for the purpose of writing an article about EOD operations *in general.*

103.   Had Defendant BOAL been honest and upfront with Plaintiff about the real purpose and intent of his reporting activities, Plaintiff would have never consented to providing Defendant BOAL with his personal and other information.

104.   The Defendants' conduct and misrepresentations as referenced above amount to Actual / Intentional Fraud committed against the Plaintiff, in that Defendants' misrepresentations were:

    a.   Material and false;

    b.   Known by Defendants to be false, or, recklessly made by Defendants without any knowledge of its / their truth as a positive assertion; and

    c.   Made with the intent that Plaintiff should act thereon.

105.   That Plaintiff acted in reliance on Defendants' misrepresentations by providing Defendant BOAL with his personal and other information.

106.   That as a direct and proximate result of Defendants' Actual / Intentional Fraud, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

**COUNT VII**

**CONSTRUCTIVE FRAUD / NEGLIGENT MISREPRESENTATION
ALL DEFENDANTS**

107.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through one hundred five (106) as if fully set forth herein.

108.    At all times relevant, Defendants owed to Plaintiff both a common law duty and a contractual duty by virtue of the express and implied agreements entered into between BOAL / PLAYBOY and the United States, and between BOAL/PLAYBOY and Plaintiff, to carefully and reasonably carry out any publications regarding the Plaintiff.

109.    Included within this ordinary duty of care is the duty and responsibility of Defendants to fully and accurately represent to Plaintiff the full purpose and full intended use of any information or likeness provided by Plaintiff to Defendants.

110.    Because Defendants never represented to Plaintiff, prior to or during the gathering and taking of Plaintiff's information, that the full purpose and intended use was not for an article about EOD operations *in general*, but for a sensationalized story and major motion picture centered around and about the Plaintiff's personal information and likeness, Defendants' conduct amounted to a negligent misrepresentation on which Plaintiff justifiably relied, to his detriment, as explained above.

111.    That as a direct and proximate result of Defendants' Constructive Fraud / Negligent Misrepresentation, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest and attorney fees.

Respectfully submitted,

**LINDA GEORGE**


s/Linda George
Linda George
Attorney for Plaintiff
577 Summit Avenue
Hackensack, New Jersey 07601
(201) 487-5225
lgdefense@yahoo.com

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, SGT. JEFFREY SARVER, by and through his attorney, LINDA GEORGE and hereby demands a trial by jury in the above-captioned matter.


Respectfully submitted,

**LINDA GEORGE**


s/Linda George
Linda George
Attorney for Plaintiff
577 Summit Avenue
Hackensack, New Jersey 07601
(201) 487-5225
lgdefense@yahoo.com