JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| JEFFREY S. SARVER | ) | Case No. 2:10-cv-09034-JHN -JCx |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | **ORDER GRANTING DEFENDANTS' MOTIONS TO STRIKE** |
| THE HURT LOCKER LLC, *et al*, | ) | |
| Defendants. | ) | |

The matter is before the Court on Defendants' Motions to Strike pursuant to Cal. Code Civ. Proc. § 425.16. (Docket no. 78, 98.) On August 8, 2011, the Court heard oral argument on the Motions and took the matter under submission. (Docket no. 125.) For the foregoing reasons, the Court GRANTS Defendants' Motions and strikes Plaintiff's Complaint in its entirety.

## I.

## FACTUAL BACKGROUND

Plaintiff Jeffrey Sarver ("Plaintiff") filed this lawsuit alleging that Defendants based the movie *The Hurt Locker* on Plaintiff's personal experiences while serving in the military, without his consent. (Compl. ¶ 23.) Plaintiff has been a member of the United States Army since 1991. (*Id.* ¶ 26.) From July 2004 through January 1005, he served in Iraq as an Explosive Ordinance Disposal ("EOD") technician with the 788th Ordinance Company. (*Id.* ¶¶ 33-50.) Plaintiff was one of approximately 150 EOD technicians in Iraq. (*Id.* ¶ 36.)

1   While Plaintiff was in Iraq, the Department of Defense permitted media

2   representatives to live, work and travel with military units.  (*Id.* ¶ 29.)  Defendant

3   Mark Boal ("Boal") was embedded with Plaintiff's unit in December 2004 as a

4   reporter for *Playboy Magazine*.[1]  (Sarver Decl. ¶¶ 11, 14.)  Boal took photographs

5   and videos of Plaintiff and his unit, following them while they were on and off

6   duty.  (*Id.* ¶ 16.)

7   After Plaintiff returned to the United States in 2005, Boal visited him in

8   Wisconsin and conducted additional interviews.  (Boal Decl. ¶ 4.)  Boal emailed a

9   copy of his article to Plaintiff and members of his unit in August 2005.  (*Id.*, Ex.

10  B.)  Boal's article, published in the August/September 2005 issue of *Playboy*

11  *Magazine*, focused entirely on Plaintiff's life and experience in Iraq.  (Compl.,

12  Ex. A.)  An amended version of the article was later published in Reader's Digest

13  in 2006.  (Sarver Decl. ¶ 32.)

14  Boal contends that he interviewed Plaintiff for the express purpose of the

15  article.  (Boal Decl. ¶ 4.)  Plaintiff, on the other hand, alleges that he never

16  consented to the use of his name or likeness.  (Sarver Decl. ¶¶ 19, 27.)  Plaintiff

17  claims that he objected to the *Playboy* article prior to its publication, but was told

18  it had already been distributed.  (Sarver Decl. ¶ 30.)

19  Boal subsequently wrote the screenplay for the motion picture *The Hurt*

20  *Locker*.  The movie was released on June 26, 2009, at which time Plaintiff was

21  stationed in New Jersey.  (*Id.* ¶¶ 33-34, 40.)  Plaintiff alleges that Will James, the

22  main character in the movie, is based on his life and experiences, without his

23  consent to the use of his story.  Plaintiff points to characteristics of Will James

24  and events in the movie mirroring his personal story.  (Sarver Decl. ¶ 41.)

25  ———————————

26  [1]   The parties dispute how long Boal was embedded in Plaintiff's unit.

27  According to Boal, he spent only 14 days with Plaintiff's unit.  (Boal Decl. ¶ 3.)
Plaintiff contends, however, that Boal followed his unit exclusively for 30 days.

28  (Sarver Decl. ¶¶ 14–15.)

1    Although Defendants argue the character was adapted from Boal's experience

2    with EOD technicians and other interviews, the actor who played Will James

3    stated in an interview, "Where they showed me, definitely a guy, there was one

4    guy they knew was like James, this character I played." (Sarver Decl., Ex. C.)

5    When the movie premiered, Plaintiff claims he attended on his own initiative. (*Id.*

6    ¶¶ 35-36).  Boal contends that he maintained contact with Plaintiff through this

7    period and invited him to the premiere.  (Boal Decl. ¶ 12.)

8         Plaintiff's lawsuit alleges that he has been harmed, and that the public

9    disclosure of his identity places him at greater risk during military operations.

10   (*Id.* ¶ 46.)  He also claims that he has been denied employment within the Joint

11   Special Operations Command after being labeled a counter-intelligence risk for

12   "selling" his movie rights.  (*Id.* ¶ 46c.)

## II.

## PROCEDURAL HISTORY

15        On March 2, 2010, Plaintiff filed a complaint in the United States District

16   Court, District of New Jersey against Defendants alleging the following

17   violations: Right of Publicity/Misappropriation of Name and Likeness; False

18   Light Invasion of Privacy; Defamation; Breach of Contract; Intentional Infliction

19   of Emotional Distress; Actual/Intentional Fraud; and Constructive

20   Fraud/Negligent Misrepresentation.  (Docket no. 1.)  The case was transferred to

21   this Court under 28 U.S.C. § 1404(a) on November 18, 2010.  (Docket no. 54.)

22        On February 1, 2011, Defendants Nicolas Chartier, Grosvenor Park Media,

23   L.P., Kingsgate Films, Inc., Greg Shapiro, The Hurt Locker, LLC, and Voltage

24   Pictures, LLC, filed a  motion to strike Plaintiff's complaint under Cal. Code Civ.

25   Proc. § 425.16 ("anti-SLAPP").  ("Hurt Locker Motion"; docket no. 78).  The

26   Motion was joined by Defendants Mark Boal and Kathryn Bigelow (docket no.

27   83), and Summit Entertainment, LLC (docket no. 82).  On March 2, 2011, Boal

28   and Bigelow filed a separate Motion to Strike.  ("Boal Motion"; docket no. 98.)

1   On March 14, 2011, Plaintiff opposed both the Hurt Locker Motion and the Boal

2   Motion in a single opposition, which was filed in two parts.  (Docket nos. 103,

3   104.)  Defendants Boal and Bigelow filed a Reply on March 21, 2011. (Docket

4   no. 116.)  The Hurt Locker Defendants joined in the Reply.  (Docket no. 117.)

5   On August 8, 2011, the Court heard oral argument and took the matter under

6   submission.[2]

7                                        **III.**

8                            **CHOICE OF LAW**

9            The Court applies the choice of law rules of New Jersey, since this case

10  was transferred from the District Court of New Jersey under 28 U.S.C. § 1404(a).

11  *See Van Dusen v. Barack*, 376 U.S. 612, 642 (1964).  New Jersey's choice of

12  laws follows the Restatement Second, Conflict of Laws.  *P.V. v. Camp Jaycee*,

13  197 N.J. 132, 139-42 (2008).  "The Second Restatement provides judges with a

14  starting point . . .It is then up to the judge to make it all work."  *P.V.*, 197 N.J. at

15  140.

16          "The rights and liabilities of the parties with respect to an issue in tort are

17  determined by the local law of the state which, with respect to that issue, has the

18  most significant relationship to the occurrence and the parties."  RESTATEMENT

19  (SECOND) OF CONFLICT OF LAWS § 145(1) (1971).  Factors that are weighed

20  include: "(a) the place where the injury occurred; (b) the place where the conduct

21  causing the injury occurred; (c) the domicil, residence, nationality, place of

22  incorporation and place of business of the parties; and (d) the place where the

23  relationship, if any, between the parties is centered."  *Id.* § 145(2). A tort occurs

24  wherever libelous material is spread, and an injured party can bring suit in "any

25  _____

26          [2] Plaintiff subsequently filed a Supplemental Brief in Opposition, and
    Defendants Boal and Bigelow filed a Reply and Objection to same. (Docket nos. 126,
27  127.)  The Court did not grant leave to file supplemental briefs and, therefore, the
    briefs are stricken.
28

forum with which the defendant has minimal contacts." *See Keaton v. Hustler*, 465 U.S. 770, 780-81 (1984).

Here, a New Jersey court would have applied California law because it has the greatest relationship with the occurrence and parties. To begin, factor (a)–the place where the injury occurred, and factor (b)–the place where the conduct causing the injury occurred, both favor California law, as the movie was produced in California. Factor (c)–the domicil, residence, nationality, place of incorporation and place of business of the parties–also militates in favor of California law. The majority of defendants reside or are incorporated in California,[3] and even though Plaintiff was stationed in New Jersey, he was there subject to orders and was not domiciled there.[4] Finally, factor (d)–the place where the relationship, if any, between the parties is centered–is neutral. The relationship between the parties was either non-existent or occurred in Iraq or Wisconsin. Accordingly, the occurrence and parties have stronger ties to California than New Jersey, and a New Jersey court would have applied California law.

## IV.

## LEGAL STANDARD

California's "anti-SLAPP" statute "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-

---

[3]Of the thirteen defendants, only Boal is domiciled outside of California.

[4] "A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return." *Banter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). "Service personnel are presumed not to acquire a new domicile when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the services." 13E Charles Alan Wright et al., Federal Practice and Procedure § 3617, 607 (3d ed. 2009)*; see also Melendez-Garcia v. Sanchez*, 629 F.3d 25, 41 (1st Cir. 2010).

1   consuming litigation." *Metabolife Int'l v. Wornick*, 264 F.3d 832, 839 (9th Cir.

2   2001).  The statute should "be construed broadly."  Cal. Code Civ. Proc. §

3   425.16(a).

4       "California courts evaluate a defendant's anti-SLAPP motion in two steps."

5   *Hilton v. Hallmark Cards*, 599 F.3d 894, 903 (9th Cir. 2010).  First, the defendant

6   must make a threshold showing that the act or acts of which the plaintiff

7   complains were in furtherance of the right of petition or free speech, and in

8   connection with a public issue.  *Id.*  Second, "the plaintiff 'must demonstrate that

9   the complaint is both legally sufficient and supported by a sufficient prima facie

10  showing of facts to sustain a favorable judgment if the evidence submitted by the

11  plaintiff is credited.'"  *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (2002) (quoting

12  *Wilson v. Parker, Covert, & Chidester*, 28 Cal.4th 811, 821 (2002)); *New.Net,*

13  *Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1098 (2004).  "This burden is 'much like

14  that used in determining a motion for nonsuit or directed verdict,' which

15  mandates dismissal when 'no reasonable jury' could find for the plaintiff."

16  *Metabolife*, 264 F.3d at 840 (quoting *Wilcox v. Superior Court*, 27 Cal. App. 4th

17  809, 824 (1994)).

18                                          **V.**

19                           **EVIDENTIARY OBJECTIONS**

20      Defendants object to portions of the Declaration of Sergeant Jeffrey S.

21  Sarver ("Sarver Decl.").  (Evidentiary Objections to Sarver Decl.; docket no.

22  112.)  The Court sustains the hearsay objection to Sarver's statement that

23  Sergeant Major James Clifford "advised" him and others in his unit that they were

24  to accommodate Boal and that Boal was only reporting on EOD operations "in

25  general".  (Sarver Decl. ¶ 12.)  The Court also sustains Defendants' objection to

26  Exhibit A, the embedded media "Ground Rules," as lacking in foundation.  The

27  Court need not rule on Defendants' remaining objections because the Court does

28  not rely on those portions of the Sarver Declaration.

1   The Court also need not address Defendants' objections to the Declaration

2   of Sergeant Paul Wilcock, and to Exhibit A attached to the Declaration of Todd J.

3   Weglarz, because the Court's ruling does not rely on these documents.

4   The Court addresses Plaintiff's evidentiary objections to the Declaration of

5   Mark Boal as needed in the Order.

6   **VI.**

7   **DISCUSSION**

8   Defendants argue that all of Plaintiff's claims must be stricken because

9   Defendants were engaged in protected speech, and Plaintiff cannot establish a

10   probability of success on his claims. Plaintiff counters that even if Defendants

11   were engaged in protected speech, he has made a prima facie showing of a

12   probability of prevailing on his claims.[5]

13   **A.    Defendants Were Engaged in the Exercise of Free Speech in**

14   **Connection to a Public Issue**

15   In order to bring an anti-SLAPP motion, Defendants must show that the

16   challenged activity is both in furtherance of free speech and in connection to a

17   public issue. Cal. Code Civ. Proc. § 425.16(b)(1); *Hilton*, 599 F.3d at 902; Cal.

18   Code Civ. Proc. § 425.16(e)(4); s*ee also Navellier*, 39 Cal. 4th at 94.

19   "The California Supreme Court has not drawn the outer limits of activity

20   that furthers the exercise of free speech rights." *Hilton*, 599 F. 3d at 903. "The

21   _____

22   [5]    As an initial matter, Plaintiff argues that Defendants' Motions were not
timely filed. (Opp'n at 1.) Anti-SLAPP motions may be filed within 60 days of the

23   commencement of an action. Cal. Code Civ. Proc. § 425.16(f). It is within the

24   discretion of the Court to accept or deny Anti-SLAPP motions after 60 days provided
the purposes of anti-SLAPP are not undermined. *See New.Net, Inc.*, 356 F.Supp. 2d

25   at 1100 (finding the motion could be considered because the case had not proceeded

26   in any material respect); *see also* Cal. Code Civ. Proc. § 425.16(f); *Kunysz v. Sandler*,
146 Cal. App. 4th 1540, 1543 (Ct. App. 2007); *Morin v. Rosenthal*, 122 Cal. App. 4th

27   673, 678-79 (Ct. App. 2004). Here, the Court exercises its discretion to review the

28   Motions, as the case has not proceeded in any material respect.

1    courts of California have interpreted this piece of the defendant's showing rather

2    loosely." *Id.* at 904.  "Motion pictures are a significant medium for the

3    communication of ideas." *Burstyn v. Wilson*, 343 U.S. 495, 501 (1952).  Thus,

4    "expression by means of motion pictures is included within the free speech and

5    free press guaranty of the First and Fourteenth Amendments." *Id.* at 502.

6         Here, Defendants have easily met the first prong of showing that they were

7    engaged in protected speech, since *The Hurt Locker* was a commercial film.

8    Indeed, Plaintiff does not attempt to argue otherwise.

9         Next, Defendants must show that the challenged activity was connected to

10   a matter of public interest.

11        California courts have held that "'an issue of public interest' . . . is any

12   issue in which the public is interested.  In other words, the issue need not be

13   'significant' to be protected by the anti-SLAPP statute–it is enough that it is one

14   in which the public takes an interest." *Tamkin v. CBS Broadcasting, Inc.*, 193

15   Cal. App. 4th 133, 144 (2011) (citation omitted.)  So long as the conduct at issue

16   is connected to the public interest in some way, anti-SLAPP protection applies.

17   *See Tamkin*, 193 Cal. App. 4th at 144 ("We believe the statutory language

18   compels us to focus on the conduct of the defendants and to inquire whether that

19   conduct furthered such defendants' exercise of their free speech rights concerning

20   a matter of public interest.  We find no requirement that the plaintiff's persona be

21   a matter of public interest.")

22        Here, the alleged portrayal of Plaintiff in the movie is connected to an issue

23   of public interest, given Plaintiff's service in the Iraq war, the importance of EOD

24   technicians in the war effort, the high-level danger of Plaintiff's duties, and

25   Plaintiff's claims that he disarmed more IEDs than any single team since

26   operations began in Iraq.

27        Furthermore, Defendants' conduct, when viewed in a broader context –the

28   investigative journalism that contributed to the writing of the *Playboy* article as

1    well as the *The Hurt Locker* screenplay–is unquestionably connected to the public

2    interest.  The heart of Plaintiff's Complaint centers on the allegation that while

3    Boal was embedded as a journalist in Plaintiff's unit, he learned information from

4    Plaintiff that he later used without Plaintiff's permission.  Moreover, both the

5    article and the movie directly address the problem of improvised explosive

6    devices and the men who defused them–an issue of paramount importance in the

7    Iraq war.  Therefore, the Court finds that Defendants have also met their burden

8    of demonstrating the second prong that their conduct is connected to a public

9    issue.

10   **B.     Plaintiff Has Not Shown a Probability of Prevailing on His Claims**

11           "To demonstrate a probability of prevailing on the merits, the plaintiff must

12   show that the complaint is legally sufficient and must present a prima facie

13   showing of facts that, if believed by the trier of fact, would support a judgment in

14   the plaintiff's favor.  The plaintiff's showing of facts must consist of evidence that

15   would be admissible at trial. The court cannot weigh the evidence, but must

16   determine whether the evidence is sufficient to support a judgment in the

17   plaintiff's favor as a matter of law, as on a motion for summary judgment."

18   *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010) (citing *Hall v.*

19   *Time Warner, Inc.*, 153 Cal. App. 4th 1337, 1346 (2007) (citations omitted).)

20           For the reasons stated below, the Court finds that Plaintiff has failed to

21   establish a prima facie showing of facts that, if accepted by the trier of fact, would

22   support judgment in his favor as a matter of law.

23       **1.     The Right of Publicity / Misappropriation Claim**

24           Plaintiff alleges that the writing, filming, production and distribution of *The*

25   *Hurt Locker* "amounted to an appropriation of plaintiff's name and/or likeness for

26   the Defendants' own use and benefit."  (Compl. ¶ 71.)

27           To state a common law right of publicity/misappropriation of name or

28   likeness claim, a plaintiff must allege: "(1) the defendant's use of the plaintiff's

1    identity; (2) the appropriation of plaintiff's name or likeness to defendant's

2    advantage, commercially or otherwise; (3) lack of consent; and (4) resulting

3    injury." *Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 417 (1983).  The

4    Ninth Circuit has expanded the common law right of publicity to include

5    protecting celebrities' interest in their identity as well as name and likeness.[6]

6    *White v. Samsung Electronics America, Inc.*, 1992 U.S. App. LEXIS 19253 (9th

7    Cir. 1992).

8         "The right of publicity, like copyright, protects a form of intellectual

9    property that society deems to have some social utility. 'Often considerable

10   money, time and energy are needed to develop one's prominence in a particular

11   field.  Years of labor may be required before one's skill, reputation, notoriety or

12   virtues are sufficiently developed to permit an economic return through some

13   medium of commercial promotion.  For some, the investment may eventually

14   create considerable commercial value in one's identity.'"  *Comedy III*

15   *Productions, Inc. v. Gary Saderup, Inc.* ("*Comedy III*"), 25 Cal. 4th 387, 399

16   (2001) (citing *Lugosi v. Universal Pictures*, 25 Cal. 3d 813,834-835 (1979) (dis.

17   opn. of Bird, C. J.))(internal citations omitted in original).  The rationale for

18   protecting the right of publicity is to prevent unjust enrichment by the theft of

19   good will.  "No social purpose is served by having the defendant get free some

20   aspect of the plaintiff that would have market value and for which he would

21   normally pay." *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576

22   ( 1977).  "What the right of publicity holder possesses is not a right of censorship,

23   _____

24        [6]  In his dissenting opinion, however, Chief Judge Kozinski warned that

25   expanding the right of publicity to include appropriation of identity, even in the

26   commercial context, cannot be squared with the First Amendment.  *White*, 989 F.2d
     at 1521 (dissent)("In the name of avoiding the "evisceration" of a celebrity's rights in

27   her image, the majority diminishes the rights of copyright holders and the public at
     large. In the name of fostering creativity, the majority suppresses it. . . . I cannot

28   agree.")

1   but a right to prevent others from misappropriating the economic value generated

2   by the celebrity's fame through the merchandising of the 'name, voice, signature,

3   photograph, or likeness' of the celebrity." *Comedy III*, 25 Cal. 4th at 403.

4   Although the theory behind the right would seem to exclude those who can not

5   claim celebrity status, California courts have analyzed misappropriation claims

6   brought by individuals who do not claim celebrity status.  *See, e.g., Polydoros v.*

7   *Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 322 (1997).

8                    **a.    The First Amendment Transformative Use Defense**

9           Defendants argue that even if Plaintiff can show a probability of prevailing

10   on the elements of a misappropriation claim, the First Amendment bars Plaintiff's

11   claim. (Boal Motion at 10; Hurt Locker Motion at 13–14.)

12          The California Supreme Court has adopted the "transformative use"

13   defense to right of publicity claims.  *Comedy III*, 25 Cal. 4th 387 (2001).  In

14   *Comedy III*, after discussing the challenges of devising a test "that will unerringly

15   distinguish between forms of artistic expression protected by the First

16   Amendment and those that must give way to the right of publicity," the Court

17   borrowed from the first fair use factor–the purpose and character of the use–in the

18   fair use defense employed in copyright law.  *Id.* at 404. "This inquiry into

19   whether a work is 'transformative' appears to us to be necessarily at the heart of

20   any judicial attempt to square the right of publicity with the First Amendment."

21   *Id.*  The Court explained that "both the First Amendment and copyright law have

22   a common goal of encouragement of free expression and creativity, the former by

23   protecting such expression from government interference, the latter by protecting

24   the creative fruits of intellectual and artistic labor."  *Id.* at 404–05.

25          The transformative use test strikes a balance between the individual's right

26   of publicity and the First Amendment right to free expression.  "In sum, when an

27   artist is faced with a right of publicity challenge to his or her work, he or she may

28   raise as [an] affirmative defense that the work is protected by the First

11

1    Amendment inasmuch as it contains significant transformative elements or that

2    the value of the work does not derive primarily from the celebrity's fame." *Id.* at

3    407.  "The test simply requires the court to examine and compare the allegedly

4    expressive work with the images of the plaintiff to discern if the defendant's work

5    contributes significantly distinctive and expressive content; i.e., is

6    'transformative.'  If distinctions exist, the First Amendment bars claims based on

7    appropriation of the plaintiff's identity or likeness; if not, the claims are not

8    barred." *Kirby*, 144 Cal. App. 4th at 61 (citing *Winter v. DC Comics*, 30 Cal. 4th

9    881, 889–891 (2003)).

10       Further, the Court in *Comedy III* suggested broad application of the

11   transformative use test: "the transformative elements or creative contributions that

12   require First Amendment protection . . . can take many forms, from factual

13   reporting to fictionalized portrayal, from heavy-handed lampooning  to subtle

14   social criticism." *Comedy III,* 25 Cal. 4th at 406 (citations omitted)

15       The Court recognizes that "the application of the defense [is] a question of

16   fact." *Hilton*, 599 F.3d at 909.  Therefore, Defendants can prevail on their

17   motions to strike only if the Court finds that they are entitled to the defense as a

18   matter of law–that is, no reasonable trier of fact could conclude that *The Hurt*

19   *Locker* was not a transformative work.  *Hilton*, 599 F.3d at 910; *see also*

20   *Polydoros*, 67 Cal. App. 4th at 323–23 (Even if the plaintiff could show that his

21   likeness was appropriated for the main character in the motion picture, *The*

22   *Sandlot*, the film is constitutionally protected.); *Guglielmi v. Spelling-Goldberg*

23   *Productions,* 25 Cal. 3d 860, 865 (1979) (Bird, J. concurring).

24       Here, the Court concludes that, even if the Will James character was based

25   on Plaintiff, no reasonable trier of fact could conclude that the work was not

26   transformative.  Defendants unquestionably contributed significant distinctive and

27

28

1   expressive content to the character of Will James.[7]  Even assuming that Plaintiff

2   and Will James share similar physical characteristics and idiosyncracies, a

3   significant amount of original expressive content was inserted in the work

4   through the writing of the screenplay, and the production and direction of the

5   movie.

6        To illustrate the expressive content contributed, Defendants cite 29

7   differences between Plaintiff's real life experience and the portrayal of Will

8   James.  (*See* Declaration of Mark Boal ¶ 8.)[8]  For example, Defendants argue that,

9   unlike Plaintiff, the character of Will James served in Afghanistan prior to serving

10  in Iraq, had an African-American teammate on his EOD team, accidentally shot

11  an American soldier while attempting to rescue him, and was redeployed to Iraq

12  after returning home (whereas Plaintiff went to work for the Army at a facility in

13  New Jersey).  (*Id.*)  Finally, Plaintiff cannot –and he does not – dispute that the

14  dialogue between characters, the other fictional characters with whom Will James

15

16  _____

17      [7]  As the court in *Polydoros* discussed, characters in fictional works are often based on real people:

18          It is generally understood that novels are written out of the
19          background and experiences of the novelist. The characters
            portrayed are fictional, but very often they grow out of real persons
20          the author has met or observed. This is so also with respect to the
            places which are the setting of the novel. The end result may be so
21          fictional as to seem wholly imaginary, but the acorn of fact is usually
22          the progenitor of the oak, which when fully grown no longer has any
            resemblance to the acorn. In order to disguise the acorn and to
23          preserve the fiction, the novelist disguises the names of the actual
24          persons who inspired the characters in his book.

25  *Polydoros*, 67 Cal. App. 4th at 323 (citing *People v. Charles Scribner's Sons*, 130 N.Y.S. 2d 514, 517–18 (1954)).

26

27      [8]  Although Plaintiff objects to the entirety of Mark Boal's Declaration on the basis that the his declaration is based upon materials Plaintiff has requested but not received, the Court overrules this overly broad objection. (Docket no. 121.)

28

1    interacted, and the direction of the actor all added significant and distinctive

2    expressive content.  Thus, the character of Will James, even if modeled after

3    Plaintiff, "is so transformed that it has become primarily the defendant's own

4    expression rather than the celebrity's likeness."  *Comedy III*, 25 Cal. 4th at 406.[9]

5        Further, the Court also employs a secondary inquiry suggested by the

6    California Supreme Court in *Comedy III* that focuses on whether the value of the

7    work is mainly derived from the fame of the plaintiff.  The Court explained:

8        Furthermore, in determining whether a work is sufficiently
         transformative, courts may find useful a subsidiary inquiry,
9        particularly in close cases: does the marketability and economic
         value of the challenged work derive primarily from the fame of the
10       celebrity depicted? If this question is answered in the negative, then
         there would generally be no actionable right of publicity. When the
11       value of the work comes principally from some source other than
         the fame of the celebrity--from the creativity, skill, and reputation of
12       the artist--it may be presumed that sufficient transformative
         elements are present to warrant First Amendment protection.

13   *Comedy III*, 25 Cal. 4th at 407.

14       Here, the value of *The Hurt Locker* unquestionably derived from the

15   creativity and skill of the writers, directors, and producers who conceived, wrote,

16   directed, edited, and produced it.  Whatever recognition or fame Plaintiff may

17   have achieved, it had little to do with the success of the movie.  Thus, Plaintiff's

18

19

20

21       [9] Plaintiff relies on a recent Northern District of California case, *Keller v.
     Electronic Arts, Inc.,* No. 09–1967, 2010 U.S. Dist. LEXIS 10719 (N.D. Cal. Feb. 8,
22   2010).  In *Keller*, the court found that the transformative use defense did not provide
     First Amendment protection when a video game developer used the likeness of a
23   college football quarterback in a football video game.  *Id.* at *16.  *Keller* is
     distinguishable because, unlike Defendants here, the defendants in *Keller* added little
24   distinctive and expressive content.  *Id.*  The plaintiff was depicted as the same height
     and weight, wearing his college football uniform, wearing the jersey number that he
25   wore in college, and playing football.  *Id.*  Moreover, while the Court finds the *Keller*
26   case to be distinguishable, the Court also notes that the case is not controlling here.
     For these reasons, the Court finds that the transformative use defense bars Plaintiff's
27
28   right of publicity claim.

1  claim is barred by the First Amendment as a matter of law.[10]  Accordingly, the

2  misappropriation claim is stricken.

3  ### 2. The Defamation Claim

4  Plaintiff alleges that *The Hurt Locker* "contained several false and

5  defamatory statements concerning the Plaintiff." (Compl. ¶ 79.)  Specifically,

6  Plaintiff alleges that he was falsely portrayed as a bad father, a man who had no

7  respect or compassion for human life and who was fascinated with the thrill of

8  war and death, and a soldier who violated military rules and regulations.  (*Id.*)

9  Plaintiff does not allege defamation claims based on the *Playboy* article.

10  "Defamation is effected by either of the following: (a) Libel. (b) Slander."

11  Cal Civ. Code § 44.  "Libel is a false and unprivileged publication by writing,

12  printing, picture, effigy, or other fixed representation to the eye, which exposes

13  any person to hatred, contempt, ridicule, or obloquy, or which causes him to be

14  shunned or avoided, or which has a tendency to injure him in his occupation." Cal

15  Civ. Code § 45.

16  As an initial matter, Defendants contend that Plaintiff's defamation claim

17  should be stricken because no reasonable person would believe that the film was

18  about Plaintiff.  (Hurt Locker Motion at 15.)  "The test is whether a reasonable

19  person, viewing the motion picture, would understand the character . . . was, in

20  actual fact, [the plaintiff] conducting herself as described."  *Aguilar v. Universal*

21  *City Studios, Inc.*, 174 Cal. App. 3d 384, 387 (1985) (citing *Bindrim v. Mitchell*,

22  92 Cal.App.3d 61, 78 (1979)).  Fictional works have no obligation to the truth.

23  _____

24  [10]  During oral argument, Defendants urge the Court to apply a malice standard

25  to Plaintiff's right of publicity claim. *See Stewart v. Rolling Stone*, 181 Cal. App. 4th
664, 682 (2010) ( "We conclude defendant publisher may assert that the actual malice

26  standard applies to claims for commercial misappropriation, whether the claims are
brought under the common law or under Civil Code section 3344.") The Court need

27  not address this argument because the Court finds that Plaintiff's claim is barred under

28  the transformative use test.

1  *See, e.g., Guglielmi*, 25 Cal. 3d at 871 (Bird, J. concurring) ("[I]n defamation

2  cases, the concern is with defamatory lies masquerading as truth. In contrast, the

3  author who denotes his work as fiction proclaims his literary license and

4  indifference to 'the facts.' There is no pretense. All fiction, by definition, eschews

5  an obligation to be faithful to historical truth.")

6      The Court agrees with Defendants that the movie is sufficiently

7  transformative such that Plaintiff's defamation claim is barred.  Further, Will

8  James is not Plaintiff's name, and the beginning of the film contains a specific

9  disclaimer that the film is a work of fiction.  (Hurt Locker Motion at 15.)

10  However, even assuming, *arguendo*, that a reasonable viewer would believe the

11  movie is about Plaintiff, he has nevertheless failed to present sufficient evidence

12  to establish a prima facie case that the depictions of him are false.

13      To state a defamation claim that survives a First Amendment challenge, . . .

14  a plaintiff must present evidence of a statement of fact that is "provably false."[11]

15  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027, 1048-1049 (2008) (citing

16  *Seelig v. Infinity Broadcasting Corp,* 97 Cal.App.4th 798, 809 (2002)).  "To

17  ascertain whether the statements in question are provably false factual assertions,

18  courts consider the 'totality of the circumstances.'" *Id.* (citing *Seelig*, 97

19

20

---

21  [11]  Typically, the plaintiff's burden of proof on a defamation claim depends on

22  whether they are public figure, or private individual.  Public figures must prove actual

malice as they can respond through the media and influence public opinion. *See New*

23  *York Times v. Sullivan*, 376 U.S. 254, 281 (1964); *Gertz*, 418 U.S. at 327-28.  Private

24  figures must only show negligence to recover actual damages.  *Khawar v. Globe*

*International, Inc.*, 19 Cal. 4th 254, 274 (1998) (citing *Brown v. Kelly Broadcasting*

25  *Co.*, 48 Cal. 3d 711, 742 (1989)).

26      Here, the Court need not determine whether Plaintiff is a public or private

27  figure because even if Plaintiff is a private figure and only has to show negligence, his

defamation claim nevertheless fails.

28

1   Cal.App.4th at 809). "Whether challenged statements convey the requisite factual

2   imputation is ordinarily a question of law for the court." *Id.*

3   Plaintiff has not established a prima facie case that the alleged depictions of

4   him are provably false.  For example, Plaintiff alleges that he is defamed because

5   Will James is portrayed as a bad father who does not love his son.  However, the

6   Court does not agree with Plaintiff's characterization of Will James as a man who

7   does not love his son.  In *The Hurt Locker*, Will James keeps photos of his son

8   with him in Iraq and is shown visiting his wife and child while on leave from

9   duty.

10   The Court also finds no support in the movie for Plaintiff's allegation that

11   he is portrayed as a man who had no respect or compassion for human life.  To

12   the contrary, *The Hurt Locker* depicts Will James as having compassion for the

13   Iraqi citizens whose lives are affected by the war.  For example, in one scene, he

14   befriends a young Iraqi boy with whom he plays soccer.  Later in the film, he

15   attempts to save a man who has been locked inside a suicide bomb vest.  Thus,

16   the Court finds Plaintiff's defamation claim to be unsupported.

17   Plaintiff also alleges he was defamed because he was portrayed as a man

18   who is fascinated with war and death.  First, the Court finds no basis for the claim

19   that Will James is fascinated with death.  However, even if the character exhibits

20   a fascination with his job and the war, given Plaintiff's statements printed in the

21   *Playboy* article, the Court does not find that this depiction is provably false.  For

22   example, Plaintiff is quoted in the *Playboy* article, describing his fascination with

23   his job:

24   Where else can I spend the morning taking apart an IED and in the
    afternoon drive down the road with 200 pounds of explosives in

25   my truck, blowing up car bombs and trucks?  I love all that stuff.
    Anything that goes boom.  It's addictive.  The thump, the boom–I

26   love it.  It's like the moth to the bright white light for me.

27

28

17

(Compl., Ex. A.) Because Plaintiff has stated that he is fascinated with his job–disarming bombs in various wars–Plaintiff does not show how this alleged defamatory portrayal is provably false.

Finally, Defendant argues that he is portrayed as a soldier who violated military rules and regulations. However, in illustration of this assertion, Plaintiff points to the fictional scene where Will James responds to a burning car bomb with a fire extinguisher. (Sarver Decl. ¶ 45(a).) The Court does not find this depiction to be a factual assertion that could result in contempt or ridicule or which causes Plaintiff to be shunned or avoided. Nor does the Court find that this scene would tend to injure Plaintiff in his occupation. Although Plaintiff declares that this depiction "causes leadership and junior soldiers to doubt his judgment," Plaintiff presents no evidence to show that this portrayal has the tendency to injure him in his occupation. Moreover, the fact that Plaintiff admits other soldiers ask him if this event really happened is evidence that the fictional presumption of the film undercuts Plaintiff's claims of defamation.

Because Plaintiff does not present evidence to support his claims of defamation, this claim is stricken.

### 3.    The False Light/ Invasion of Privacy Claim

Plaintiff alleges that *The Hurt Locker* portrayed him in a false light because the Will James character is "a major misrepresentation of his character" and "highly offensive to a reasonable person." (Compl. ¶ 76.)

To succeed on a false light claim, the portrayal must be both false and highly offensive to a reasonable person. *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 238 (1986); *see also M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 636 (2001) (stating "a 'false light' claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such."). Fair but unflattering depictions are not actionable. *See Aisenson v. Am. Broad. Co.*, 220 Cal. App. 3d 146, 161 (1990).

1    "[N]o person shall have more than one cause of action for damages for libel

2    or slander or invasion of privacy or any other tort founded upon any single

3    publication or exhibition or utterance."  *Id.* at 630 *(*quoting Cal. Civ. Code §

4    3425.3); *Selleck v. Globe Int'l*, 166 Cal. App. 3d 1123, 1135 (1988).  "Courts

5    have interpreted the single-publication rule to mean that a plaintiff may have only

6    one cause of action for one publication."  *M.G.*, 89 Cal. App. 4th at 630.

7    Here, Plaintiff's false light claim and his defamation claims are redundant

8    because they are based on the same publication or utterance.  Accordingly, the

9    Court may strike the false light claim on this ground alone.  However, even if this

10   claim were considered, the portrayal of Plaintiff was not highly offensive to a

11   reasonable person.  If the character of Will James was in fact modeled on

12   Plaintiff, then Plaintiff was portrayed as a war hero, struggling with presumably

13   the same conflicts experienced by many modern military soldiers, deployed in a

14   foreign country.  For these reasons, the false light claim fails.

15   ### 4.    The Breach of Contract Claim

16   Plaintiff alleges that he was a third party beneficiary to a contract between

17   Boal and the United States Department of Defense which restricted Boal's

18   reporting to military operations in general.  (Compl. ¶ 87.)  Boal allegedly

19   breached the contract by reporting about Plaintiff's personal life.  (*Id.* ¶¶ 90, 91.)

20   "A third party beneficiary must show the contract was made expressly for

21   his or her benefit."  *Sofias v. Bank of America*, 172 Cal. App. 3d 583, 587 (1985).

22   The third party must be benefitted in direct and unmistakable language.  *Id.*

23   Here, Plaintiff cannot prove a probability of success on this claim because

24   he provides no evidence of any contract between Boal and the Department of

25   Defense.  While Plaintiff has attached a Public Affairs Guidance Cable to which

26   embedded reporters in Iraq were required to adhere (Pl.'s Ex. A ¶ 4), the Court

27   has deemed this evidence inadmissible due to lack of foundation.

28

1   Further, even if this document were considered, Plaintiff's claim still fails.

2   Plaintiff argues that Defendant Boal breached paragraph 4.F.14 which precluded

3   the media from releasing service member's names and home towns without

4   consent.  Paragraph 4.A. states "all interviews with service members will be on

5   the record."  By his own admission, Plaintiff voluntarily discussed his

6   background and experiences with Boal, thereby implicitly consenting to the

7   publication of that information.  Thus, the language in the alleged contract

8   undermines Plaintiff's argument that the contract was breached.  Moreover, there

9   is no indication that Plaintiff was a third party beneficiary, assuming that a

10  contract existed between Boal and the Department of Defense.  For these reasons,

11  Plaintiff's breach of contract claim is stricken.

### 5.     The Intentional Infliction of Emotional Distress Claim

13  Plaintiff alleges that Defendants appropriated his likeness without his

14  consent and depicted him in embarrassing and unflattering ways which

15  proximately caused him severe emotional distress. (Compl. ¶¶ 93–96.)

16  To sustain a claim for the intentional infliction of emotional distress, a

17  plaintiff must prove: (1) defendant's conduct was extreme and outrageous; (2)

18  plaintiff suffered severe or extreme emotional distress; and (3) defendant's

19  conduct proximately caused the injury.  *Cervantez v. J.C. Penney Co., Inc.*, 24

20  Cal. 3d 579, 593 (1979).  The first prong is evaluated from the standpoint of a

21  reasonable person, excluding those who are overly sensitive or callous.  *Miller v.*

22  *Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1487 (1986).

23  In this case, Plaintiff has failed to establish a probability of success on his

24  intentional infliction of emotional distress claim.  First, because Plaintiff's claim

25  of misappropriation fails, the claim of intentional infliction of emotional distress

26  based on the misappropriation claim must also necessarily fail.  Second, the

27  infliction of emotional distress claim fails because Defendants' behavior was

28  neither extreme nor outrageous.  Boal was embedded in Plaintiff's unit to report

on the efforts of Plaintiff's bomb disposal unit in the Iraq war.  The fact that his report led to a screenplay which became a movie is not outrageous.  Rather it is commonplace that movies are based on real events.  Further, Plaintiff voluntarily submitted to interviews with Boal both in Iraq as well as after returning home to Wisconsin.  (Sarver Decl. ¶¶ 20, 22.)  Finally, even if the lead character was based on Plaintiff, Defendants used a fictional name for the character, which falls short of extreme and outrageous conduct.  Accordingly, the claim of intentional infliction of emotional distress is stricken.

### 6. The Fraud and Negligent Misrepresentation Claims

Plaintiff asserts claims of fraud, constructive fraud, and negligent misrepresentation based on the allegations that Boal misrepresented to Plaintiff that he embedded in Plaintiff's military unit to report on military operations in general.  Plaintiff alleges that he relied on the misrepresentation to his detriment.  (*Id.* ¶¶ 98, 103–107.)

"To state a cause of action for fraud, a plaintiff must allege: (a) misrepresentation; (b) knowledge of falsity; (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d. 1101, 1140-41 (C.D. Cal. 2003).

The tort of constructive fraud requires a plaintiff allege: (1) a fiduciary or contractual relationship; (2) an act, omission, or concealment involving breach; (3) reliance; (4) damage. *Id.* at 1142.

"The elements of a cause of action for negligent misrepresentation are the same as those of a claim for fraud, with the exception that the defendant need not actually know the representation is false." *Id.* at 1141.

Here, Plaintiff has not presented facts that, if credited, would establish actual or constructive fraud.  First, Plaintiff does not submit any admissible evidence that Boal misrepresented that his only intent was to report on  EOD technicians in general.  Nor does Plaintiff present any admissible evidence that

Boal obfuscated the fact that he was writing a screenplay based on the *Playboy* article.  For this same reason, Plaintiff's negligent misrepresentation claim also fails.  Second, Plaintiff has failed to provide any evidence of a fiduciary or contractual relationship between himself and Boal, which is required for a claim of constructive fraud.[12]  Accordingly, these claims are stricken.

**C.     Defendants are Entitled to Attorney's Fees**

"A prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs."  Cal. Code Civ. Proc. § 425.16(c)(1).  "Any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees."  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1018 (2001).

Defendants in this case, as the prevailing party on a special motion to strike, are entitled to attorney's fees.  Accordingly, the Court awards attorney's fees to Defendants.

**VII.**

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Motions (docket nos. 78, 98).  Plaintiff's Complaint is stricken in its entirety.

**IT IS SO ORDERED.**

Dated: October 13, 2011

_____
Hon. Jacqueline H. Nguyen
UNITED STATES DISTRICT COURT

---

[12] Defendants also argue that Plaintiff's claim of fraud against Boal for the *Playboy* article should be stricken as the statute of limitations has passed.  There is a three-year statute of limitations for fraud under California law, starting when the fraud is discovered.  Cal. Code Civ. Proc. § 338(d).  The Court agrees.  The *Playboy* article was published in August/September 2005 and Plaintiff received a copy in August 2005, but failed to file this action for more than five years.  As such, the fraud claim against Defendant Boal for the *Playboy* article is also stricken on this basis.