1  CHRISTOPHER L. RUDD, SBN: 130713
   NATHAN S. MILLER, SBN: 240278
2  MARY CASTRO-AYALA, SBN: 242267
   **MILLER & AYALA, LLP**
3  191 W. Shaw Avenue, Suite 102
   Fresno, California 93704
4  Telephone: (559) 222-6622
   Facsimile:  (559) 222-6626
5
   **Attorneys for Plaintiff:**
6  **THE REVENUE RESOURCE GROUP, LLC**
7

(SPACE BELOW FOR FILING STAMP ONLY)

FILED

JAN - 6 2011

FRESNO COUNTY SUPERIOR COURT
By _____
                        LE - DEPUTY

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                          **COUNTY OF FRESNO**

10                                              11 CE CG 0 0 0 5 8

11  THE REVENUE RESOURCE GROUP, a          )   Case No:
    California limited liability company, dba )
12  MOBILE RESOURCE CARD,                   )   **VERIFIED COMPLAINT FOR:**
                                            )
13            Plaintiff,                    )   1.   BREACH OF CONTRACT
                                            )        (Celebrity Endorsement Agreement);
14       v.                                 )   2.   BREACH OF CONTRACT
                                            )        (Launch Agreement);
15  DASH DOLLS, a California limited liability )  3.   BREACH OF GOOD FAITH AND
    company, KIMBERLY KARDASHIAN, an      )        FAIR DEALING;
16  individual, KHLOE KARDASHIAN-ODOM,    )   4.   NEGLIGENT
    an individual, KOURTNEY KARDASHIAN,    )        MISREPRESENTATION
17  an individual, KRIS KARDASHIAN aka     )        (Celebrity Endorsement Agreement);
    KRIS KARDASHIAN-JENNER aka KRIS       )   5.   NEGLIGENT
18  JENNER, an individual, and Does 1-50   )        MISREPRESENTATION
    inclusive,                             )        (Launch Agreement);
19                                          )   6.   NEGLIGENT INTERFERENCE
            Defendants.                     )        WITH PROSPECTIVE
20                                          )        ECONOMIC ADVANTAGE;
                                            )   7.   UNJUST ENRICHMENT;
21                                          )   8.   CONSTRUCTIVE TRUST;
                                            )   9.   ACCOUNTING
22                                          )
                                            )
23  _____)

24  ///

25  ///

26  ///

27  ///

28  ///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
1

Exhibit C

## GENERAL ALLEGATIONS

PLAINTIFF, THE REVENUE RESOURCE GROUP, LLC, doing business as MOBILE RESOURCE CARD (hereinafter "RRG") alleges against corporate defendant, DASH DOLLS, LLC (hereinafter "DASH") and individual defendants, KIMBERLY KARDASHIAN (hereinafter "KIM KARDASHIAN"), KHLOE KARDASHIAN KARDASHIAN-ODOM (hereinafter "KHLOE KARDASHIAN"), KOURTNEY KARDASHIAN (KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN collectively referred hereinafter as the "KARDASHIANS") and KRIS KARDASHIAN aka KRIS KARDASHIAN-JENNER aka KRIS JENNER (hereinafter "KRIS JENNER")(all defendants collectively referred to hereinafter as "DEFENDANTS") as follows:

1. RRG is a California limited liability company and at all times relevant and mentioned herein, was a California limited liability company in good standing with its principal place of business in Fresno, California.

2. RRG is engaged solely in the business of manufacturing, distributing and selling a customized prepaid debit card program to consumers.

3. RRG is informed and believes and thereupon alleges that DASH is, and at all times relevant and mentioned herein, was a California limited liability company with its principal place of business in Los Angeles, California.

4. RRG is informed and believes and thereupon alleges that KIM KARDASHIAN is and at all times relevant and mentioned herein, was an individual residing in Los Angeles County, California.

5. RRG is informed and believes and thereupon alleges that KHLOE KARDASHIAN is and at all times relevant and mentioned herein, was an individual residing in Los Angeles County, California.

6. RRG is informed and believes and thereupon alleges that KOURTNEY KARDASHIAN is and at all times relevant and mentioned herein, was an individual residing in Los Angeles County, California.

///

Exhibit C

7.     RRG is informed and believes and thereupon alleges that KRIS JENNER is and at all times relevant and mentioned herein, was an individual residing in Los Angeles County, California.

8.     RRG is informed and believes and thereupon alleges that KRIS JENNER is and at all times relevant and mentioned herein, was the manager of the KARDASHIANS, and had the authority to enter into negotiations for and bind the KARDASHIANS in agreements with third-parties such as RRG.

9.     RRG is informed and believes and thereupon alleges that the KARDASHIANS created DASH solely for the purpose of protecting themselves from individual liability.

10.    There exists, and at all times mentioned herein existed, a unity of interest and ownership between the KARDASHIANS and DASH, such that any individuality and separateness between the KARDASHIANS and DASH have ceased and DASH is the alter ego of the KARDASHIANS in that the KARDASHIANS controlled, dominated, managed, and operated DASH to suit their own conveniences.

11.    RRG is informed and believes and thereupon alleges that adherence to the fiction of the separate existence of DASH as an entity separate and distinct from the KARDASHIANS would permit an abuse of the corporate privilege and would promote injustice in that the KARDASHIANS in fact controlled, dominated, managed, and operated DASH to suit their own conveniences, ignoring corporate formalities, and using the corporation as a device in an attempt to avoid individual liability, and using the alter ego of the corporation as a means to mistreat RRG for reasons of a personal agenda, while maintaining their own California limited liability corporate status.

12.    Jurisdiction and Venue are proper in Fresno, California pursuant to Paragraph 21 of the Celebrity Endorsement Agreement (the "AGREEMENT") entered into between RRG and the KARDASHIANS and DASH on June 16, 2010, a true and correct copy of which has been attached hereto and incorporated by reference herein as Exhibit "A."

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

1    13.    RRG is unaware of the true names, identities and capacities of Defendants

2  sued herein as DOES 1 through 50, inclusive, and therefore sues said Defendants by such fictitious

3  names, pursuant to California Code of Civil Procedure Section 474. RRG will seek leave of court

4  to amend this complaint to allege the true names and capacities of said DOE Defendants when

5  ascertained. RRG is informed and believes and thereupon alleges that each of the fictitiously named

6  Defendants are responsible for the occurrences alleged herein and are liable to RRG for the damages

7  proximately caused thereby.

8    14.    RRG alleges on the information and belief that each of the Defendants were

9  the agents of the other on all of the actions set forth herein, that each was acting in the course and

10  scope of its agency with its principle, and that every act of each Defendant was ratified by the others.

11                        **FACTUAL ALLEGATIONS**

12    15.    RRG was and at all times relevant and mentioned herein, an Independent Sales

13  Organization or "ISO" authorized to market the prepaid debit cards to consumers from the

14  University National Bank in Minneapolis, Minnesota as the "issuing bank."

15    16.    RRG, as an ISO, entered into an agreement with a technology provider, Mobe,

16  Inc. ("Mobe") to provide the complex technology that allows the customized prepaid debit card to

17  be used in various ways desired by the consumer, the issuing bank, a "network provider", (such as

18  Visa, or in this case MasterCard) and other entities, such as a payment processor.

19    17.    Prepaid debit cards have become an increasingly popular way for consumers

20  to pay for items rather than carrying cash or using traditional credit cards. RRG has worked hard to

21  achieve the highest standard of care by utilizing the most advanced technology available for the

22  prepaid debit cards that it offered to consumers. Prepaid consumer debit cards have various

23  convenience and safety features that may make them a superior alternative to using cash or

24  traditional credit cards for many consumers.

25  ///

26  ///

27  ///

28  ///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
4

Exhibit C

18.     RRG is informed and believes and thereupon alleges that consumers using prepaid debit cards are typically charged a series of different types of fees for using those cards. RRG is informed and believes and thereupon alleges those fees are set by the issuing bank, and may include transaction fees. RRG is informed and believes and thereupon alleges the fees for prepaid debit cards are disclosed to the consumer prior to the consumer's purchase of the prepaid debit card.

19.     On behalf of the KARDASHIANS and DASH, KRIS JENNER engaged in negotiations with RRG for the promotion and sale of the KARDASHIAN MasterCard prepaid debit card.   KRIS JENNER demanded that KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN each receive equal compensation for RRG's right and license to utilize their names, nicknames, initials, autographs, facsimile signatures, photographs, likenesses, and endorsements of the KARDASHIAN MasterCard prepaid debit card.

20.     On or about June 16, 2010, RRG and the KARDASHIANS and DASH entered into the AGREEMENT. See Exhibit "A." Pursuant to the AGREEMENT, RRG acquired the exclusive right and license to utilize the KARDASHIANS names, nicknames, initials, autographs, facsimile signatures, photographs, likenesses, and endorsements (hereinafter the "PROPERTY") in connection with the marketing and sale of the MasterCard prepaid debit card in the name of the KARDASHIANS (hereinafter the "KARDASHIAN KARD").

21.     Pursuant to Paragraph 1 and 2 of the AGREEMENT, the KARDASHIANS granted RRG the exclusive and worldwide right and license to use the PROPERTY to market, advertise, promote, and sell the KARDASHIAN KARD, in any manner determined by RRG, at the discretion of RRG, for a term of two (2) years (hereinafter "ROYALTY TERM.") Upon mutual agreement of the parties, the AGREEMENT could be renewed unlimited number of additional one (1) year terms.

///

///

///

///

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

22.     In consideration for entering into the AGREEMENT, RRG agreed to pay DASH on behalf of the KARDASHIANS, the sum of Three Dollars ($3.00) for each KARDASHIAN KARD activated or sold each month the card remained active during the ROYALTY TERM. RRG further agreed to pay DASH on behalf of the KARDASHIANS, twenty-five percent (25%) of the usage or transaction fees RRG received from the financial institution during the ROYALTY TERM (hereinafter "ROYALTY" or "ROYALTIES").   See Paragraph 3, Subdivision (A) of the AGREEMENT attached hereto as Exhibit "A."

23.     In consideration for entering into the AGREEMENT, RRG agreed to pay DASH the total sum of Seventy-Five Thousand Dollars ($75,000.00) as an advance on the ROYALTIES. RRG agreed to pay Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) upon the signing of the AGREEMENT ("Initial Deposit") and to pay an additional Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) six (6) months after the signing of the AGREEMENT ("Additional Deposit"). See Paragraph 3, Subdivision (A) of the AGREEMENT attached hereto as Exhibit "A."

24.     On June 17, 2010, RRG paid to DASH on behalf of the KARDASHIANS, the Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00). See copy of RRG's cashier's check paid to DASH on behalf of the KARDASHIANS attached hereto and incorporated herewith as Exhibit "B."

25.     On or about June 17, 2010, DASH on behalf of the KARDASHIANS, accepted the Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) paid by RRG. To the present date, neither DASH nor the KARDASHIANS have returned RRG's Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00).

26.     In the AGREEMENT, the KARDASHIANS acknowledged and agreed that each customer would be required to pay an initial fee of Nine Dollars and Ninety-Five Cents ($9.95)("Set Up Fee") and that they would not receive a ROYALTY on any Set Up Fees paid. See Paragraph 3, Subdivision (E) of the AGREEMENT attached hereto as Exhibit "A."

///

///

Exhibit C

27.     In the AGREEMENT, the KARDASHIANS agreed to be available for, to cooperate in and participate in photo sessions, marketing, advertising, publicity, interviews, and similar activities related to the KARDASHIAN KARD, as reasonably requested by RRG. See Paragraph 4, Subdivision (A) of the AGREEMENT attached hereto as Exhibit "A."

28.     Pursuant to the AGREEMENT, KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN each individually agreed to appear at least three (3) times per calendar year, for a total of nine (9) appearances, at a studio located in Los Angeles, California area to participate in the production of video recordings, photographs and other promotional materials as reasonably requested by RRG to promote the KARDASHIAN KARD. KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN agreed to participate in at least two (2) of the nine (9) sessions together. See Paragraph 4, Subdivision (B) of the AGREEMENT attached hereto as Exhibit "A."

29.     Pursuant to the AGREEMENT, KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN each individually agreed to make at least three (3) public appearances each calendar year, for a total of nine (9) appearances, to promote the KARDASHIAN KARD, as reasonably requested by RRG. KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN agreed to appear together for at least two (2) of the nine (9) appearances. See Paragraph 4, Subdivision (C) of the AGREEMENT attached hereto as Exhibit "A."

30.     In the AGREEMENT, the KARDASHIANS agreed to participate in sessions and appearance only after a thirty (30) day notice and acceptance of the session or appearance. All of KARDASHIANS expenses were to be submitted and approved by RRG in writing prior to any session or appearance. See Paragraph 4, Subdivision (D) of the AGREEMENT attached hereto as Exhibit "A."

///

///

///

///

Exhibit C

31.     Pursuant to Paragraph 5 of the AGREEMENT, the KARDASHIANS agreed to actively and regularly market the KARDASHIAN KARD in all fora (sic) available to them including, but not limited to, social networking websites such Twitter, Facebook, blogs, QVC, reality television programs, talk and/or entertainment shows, news shows, morning shows, specials and live shows, radio programs, personal appearances, events, press conferences, articles, magazines, websites, and other media yet be developed.  The KARDASHIANS agreed to "tweet" about the KARDASHIAN KARD and to mention the KARDASHIAN KARD on Facebook.  Further, KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN agreed to link to the KARDASHIAN KARD on their websites 'above the fold' on the principal landing page, in a size to be agreed upon, but not smaller than 180 x 150 pixels surrounded by graphics.  The link was to be operational and displayed on KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN's websites for viewing by all visitors all of the time.  RRG was to pay all related costs.

32.     Pursuant to the AGREEMENT, the KARDASHIANS agreed to provide RRG with contact information for all authorized KARDASHIAN distributors.  Further, the KARDASHIANS agreed to actively promote the KARDASHIAN KARD with its distributors and others to purchase other products, including KARDASHIAN-endorsed products. See Paragraph 6 of the AGREEMENT attached hereto as Exhibit "A."

33.     Pursuant to Paragraph 7 of the AGREEMENT, all notices were required to be in writing and mailed via certified or registered mail, return receipt requested, or by a national overnight express service, to such address as designated in writing by the parties.

34.     Pursuant to Paragraph 12 of the AGREEMENT, RRG was obligated to pay all financial costs associated with the creation, launch, promotion and management of the KARDASHIAN KARD.

///

///

///

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

35.     The KARDASHIANS and/or DASH agreed to indemnify, defend and hold harmless RRG from any damages for costs, expenses, and losses (including reasonable attorney fees and costs) arising from the acts or omissions of the KARDASHIANS and/or DASH if the KARDASHIANS and/or DASH failed to perform the terms of the AGREEMENT. See Paragraph 13 of the AGREEMENT attached hereto as Exhibit "A."

36.     The KARDASHIANS agreed to comply with all of the rules and regulations imposed by MasterCard in the use and promotion of the KARDASHIAN KARD. See Paragraph 14 of the AGREEMENT attached hereto as Exhibit "A."

37.     On or about September 2010, RRG provided the KARDASHIANS, KRIS JENNER and/or DASH with the rules and regulations imposed by MasterCard for the KARDASHIAN KARD.

38.     On October 11, 2010, RRG contacted the KARDASHIANS, KRIS JENNER and/or DASH to schedule time with KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN before the launch event for the KARDASHIAN KARD on November 9, 2010, to review the fee schedules and the rules and regulations of the KARDASHIAN KARD once again before the official launch of the KARDASHIAN KARD. See email from Nancy Torosian of RRG to KRIS JENNER dated October 11, 2010, attached hereto and incorporated herewith as Exhibit "C."

39.     On October 22, 2010, RRG provided the KARDASHIANS, KRIS JENNER and/or DASH with the fee schedule imposed by University National Bank for the KARDASHIAN KARD and a brief explanation of how the costs associated with the  KARDASHIAN KARD compared to other comparable prepaid debit cards like the Rush Card (Russell Simmons) prepaid debit card. See email from Nancy Torosian of RRG to KRIS JENNER dated October 22, 2010, attached hereto and incorporated herewith as Exhibit "D."

///

///

///

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

40. On November 11, 2010, RRG provided the KARDASHIANS, KRIS JENNER and/or DASH with another summary of the fee schedule imposed by University National Bank for the KARDASHIAN KARD. See email from Nancy Torosian of RRG to the KARDASHIANS and/or DASH dated November 11, 2010, attached hereto and incorporated herewith as Exhibit "E." On or about November 2010, RRG provided the KARDASHIANS, KRIS JENNER and/or DASH with a summary of the fee schedule imposed by University National Bank for the KARDASHIAN KARD. Attached hereto and incorporated herewith as Exhibit "F" is a true and correct copy of the fee schedule imposed by University National Bank that was provided to the KARDASHIANS, KRIS JENNER and/or DASH.

41. Pursuant to Paragraph 15 of the AGREEMENT, RRG was required to obtain and maintain, at its own expense, a product liability insurance policy issued by an insurance company licensed to do business in California and having an AM Best rating of B+ or better, naming the KARDASHIANS as additional insureds. RRG obtained the product liability policy as required on September 14, 2010.

42. The KARDASHIANS could only terminate the AGREEMENT upon thirty (30) days written notice to RRG if RRG was adjudicated to be insolvent or declared bankruptcy, or failed to pay the KARDASHIANS any amount due pursuant to the AGREEMENT within sixty (60) days of the due date of the payment or failed to maintain product liability insurance as herein provided. See Paragraph 17 of the AGREEMENT attached hereto as Exhibit "A."

43. RRG has not been adjudicated to be insolvent, declared bankruptcy or failed to pay the KARDASHIANS any amount due pursuant to the AGREEMENT.

44. The KARDASHIANS agreed that RRG could continue to market and sell the KARDASHIAN KARD in accordance with the AGREEMENT for a period of three (3) months following the termination of the AGREEMENT. See Paragraph 18, Subdivision (B) of the AGREEMENT attached hereto as Exhibit "A."

///

///

///

Exhibit C

45.    The prevailing party of any action taken to interpret or enforce the AGREEMENT, including litigation or arbitration, shall be entitled to recover from the non-prevailing party its reasonable expenses and costs, including reasonable attorneys' fees and post-judgment or post-decision enforcement, collection and appeal expenses. See Paragraph 27 of the AGREEMENT attached hereto as Exhibit "A."

46.    RRG prepared for the launch of the KARDASHIAN KARD by promoting and funding a launch event held at PACHA, in New York, New York, on November 9, 2010. On September 29, 2010, KRIS JENNER contractually obligated the KARDASHIANS to appear together at PACHA and remain in the club for the launch of the KARDASHIAN KARD for a period of time no less than three (3) hours (hereinafter "LAUNCH AGREEMENT"). See LAUNCH AGREEMENT attached hereto and incorporated herewith as Exhibit "G."

47.    In connection with the LAUNCH AGREEMENT, RRG paid a total sum of not less than Sixty-Five Thousand Dollars ($65,000.00) for the promotion and launch of the KARDASHIAN KARD at PACHA. This sum includes, but is not limited to, the costs associated with the venue, travel costs for RRG, travel costs for KHLOE KARDASHIAN, hotel expenses for KHLOE KARDASHIAN, meals, car service for the KARDASHIANS, hair and makeup for the KARDASHIANS, employment of three (3) public relation firms to promote the KARDASHIAN KARD, photographers, various marketing materials, printed invitations, and floral arrangements for the KARDASHIANS.

48.    The KARDASHIANS appeared at the launch event for the KARDASHIAN KARD on November 9, 2010. The KARDASHIANS left PACHA after only fifty-five (55) minutes. The KARDASHIANS returned to PACHA upon the demand of RRG after twenty (20) minutes, and stayed for an additional forty (40) minutes, for a total of one (1) hour and thirty-five (35) minutes.

///

///

///

///

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

49.     RRG is informed and believes and thereupon alleges that the KARDASHIANS behavior at the launch event for the KARDASHIAN KARD in New York was widely and negatively reported upon.   Moreover, RRG is further informed that immediately following the initial negative publicity the press and other public figures thereafter began a drumbeat of negative reporting and comment, directed at certain financial aspects of the KARDASHIAN KARD.   RRG had no control over the "up front" annual fees being demanded for the KARDASHIAN KARD.

50.     On November 29, 2010, counsel for DASH and/or the KARDASHIANS caused an email to be sent to RRG with an attached termination letter that terminated the AGREEMENT between the KARDASHIANS and RRG effective immediately.   RRG is informed and believes and thereupon alleges that counsel for DASH simultaneously sent a copy of the termination letter to media outlets. RRG was notified by the media coverage of the termination letter sent by counsel for DASH. RRG is informed and believes and thereupon alleges that DASH notified the public that it was terminating the AGREEMENT before it properly notified RRG. Attached hereto and incorporated herewith as Exhibit "H" is a true and correct copy of the KARDASHIAN/DASH November 29, 2010, termination letter.

51.     On November 29, 2010, RRG received an email from counsel for University National Bank terminating its ISO.   Immediately upon having its ISO revoked, RRG was prevented from operating and doing business.

52.     Following the fiasco caused by the KARDASHIANS behavior at the launch event in New York and gaining intensity through the public termination of the AGREEMENT by the KARDASHIANS, RRG was wrongfully subjected to public ridicule and negative publicity regarding its company and its products, including the KARDASHIAN KARD. RRG was wrongfully and negatively targeted for setting the pricing structure and fee schedule for the KARDASHIAN KARD.

///

///

///

Exhibit C

53.     The KARDASHIANS negotiated with RRG for the creation and promotion of the KARDASHIAN KARD.   RRG disclosed all pricing and fees associated with the KARDASHIAN KARD. RRG is informed and believes and thereupon alleges that the KARDASHIANS denied knowing about the costs associated with the KARDASHIAN KARD and publically terminated its AGREEMENT with RRG.

54.     RRG has wrongfully been the subject of numerous negative articles, negative reports on business and entertainment news, and a Saturday Night Live parody.  The misplaced negative publicity focused on RRG following the public termination of the AGREEMENT by the KARDASHIANS has forced RRG to cease operating and conducting business.

55.     After the LAUNCH of the KARDASHIAN KARD, RRG began negotiations with other celebrities such as Fernando Vargas and Vicente Fernandez, as well as other celebrities, for their celebrity endorsement of their own MasterCard prepaid debit card.  RRG is informed and believes that Fernando Vargas and Vicente Fernandez would have entered into an agreement with RRG for their own MasterCard prepaid debit card if RRG would have been able to continue to conduct business.

## FIRST CAUSE OF ACTION

### (Breach of Contract "AGREEMENT" Against DASH and the KARDASHIANS)

56.     RRG incorporates by reference each and every allegation contained in paragraph 1 through 45 and 49 through 55 of this Verified Complaint as though fully set forth herein.

57.     Pursuant to the AGREEMENT, RRG had the exclusive right and license to utilize the PROPERTY in connection with the market and sale of the KARDASHIAN KARD.

58.     Pursuant to the AGREEMENT, RRG had the exclusive and worldwide right and license to use the PROPERTY to market, advertise, promote, and sell the KARDASHIAN KARD, in any manner determined by RRG, at the discretion of RRG, for the ROYALTY TERM.

59.     Pursuant to the AGREEMENT, the KARDASHIANS were contractually obligated to be available for, to cooperate in and participate in photo sessions, marketing, advertising, publicity, interviews, and similar activities related to the KARDASHIAN KARD.

///

Exhibit C

60.     Pursuant   to   the   AGREEMENT,   KIM   KARDASHIAN,   KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN were each individually contractually obligated to appear at least three (3) times per calendar year, for a total of nine (9) appearances, at a studio located in Los Angeles, California area to participate in the production of video recordings, photographs and other promotional materials as reasonably requested by RRG to promote the KARDASHIAN KARD.   Pursuant to the AGREEMENT, KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN were contractually obligated to participate in at least two (2) of the nine (9) sessions together.

61.     Pursuant   to   the   AGREEMENT,   KIM   KARDASHIAN,   KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN were each individually contractually obligated to make at least three (3) public appearances each calendar year, for a total of nine (9) appearances, to promote the KARDASHIAN KARD, as reasonably requested by RRG.   Pursuant to the AGREEMENT,   KIM   KARDASHIAN,   KHLOE   KARDASHIAN,   and   KOURTNEY KARDASHIAN were contractually obligated to appear together for at least two (2) of the nine (9) appearances.

62.     Pursuant to the AGREEMENT, the KARDASHIANS were contractually obligated to actively and regularly market the KARDASHIAN KARD in all forums available to them including, but not limited to, Twitter, Facebook, blogs, QVC, reality television programs, talk and/or entertainment shows, news shows, morning shows, specials and live shows, radio programs, personal appearances, events, press conferences, articles, magazines, websites, and other mediums that may not yet be developed.   The KARDASHIANS were contractually obligated to "tweet" about the KARDASHIAN KARD and to mention the KARDASHIAN KARD on Facebook.   Further, KIM KARDASHIAN , KHLOE KARDASHIAN and KOURTNEY KARDASHIAN were contractually obligated to place a link to the KARDASHIAN KARD on their websites.

63.     Pursuant to the AGREEMENT, the KARDASHIANS were contractually obligated to provide RRG with contact information for all authorized KARDASHIAN distributors and to actively promote the KARDASHIAN KARD with its distributors and others to purchase other products, including KARDASHIAN-endorsed products.

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
14

Exhibit C

64.     Pursuant to the AGREEMENT, the KARDASHIANS and/or DASH was contractually required to properly notice RRG in writing via certified or registered mail, return receipt requested, or by a national overnight express service, at RRG's designated address.

65.     Pursuant to the AGREEMENT, the KARDASHIANS could only validly terminate the AGREEMENT upon thirty (30) days written notice to RRG if RRG was adjudicated to be insolvent or declared bankruptcy, or if RRG failed to pay the KARDASHIANS any amount due pursuant to the AGREEMENT within sixty (60) days of the due date of the payment or failed to maintain product liability insurance as herein provided.

66.     Pursuant to the AGREEMENT, RRG was contractually obligated to pay all financial costs associated with the creation, launch, promotion and management of the KARDASHIAN KARD.  RRG performed its contractual obligation by paying for the creation, launch, promotion and management of the KARDASHIAN KARD.

67.     Pursuant to the AGREEMENT, RRG was contractually obligated to pay DASH on behalf of the KARDASHIANS an Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) upon the signing of the AGREEMENT.  RRG performed its contractual obligation by rendering a cashier's check to DASH on behalf of the KARDASHIANS in the amount of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) on June 17, 2010, for the Initial Deposit.

68.     Pursuant to the AGREEMENT, RRG was contractually obligated to obtain and maintain, at its own expense, a product liability insurance policy. RRG performed its contractual obligation by obtaining product liability insurance on September 16, 2010.

69.     RRG has performed all conditions, covenants and promises required by it on its part to be performed in accordance with the terms and conditions of the AGREEMENT except those conditions, covenants, or promises which have been prevented or excused by the actions of DASH and/or the KARDASHIANS.

///

///

///

MILLER & AYALA, LLP
91 W. Shaw Ave., #102
resno, CA 93704
559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
15

Exhibit C

70.     RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS breached the AGREEMENT by preventing RRG from utilizing its exclusive and worldwide right and license to utilize the PROPERTY to market, advertise, promote, and sell the KARDASHIAN KARD, in any manner determined by RRG, at the discretion of RRG, for the ROYALTY TERM.

71.     RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS breached the AGREEMENT by not making themselves available for, cooperating in and participating in photo sessions, marketing, advertising, publicity, interviews, and similar activities related to the KARDASHIAN KARD, as reasonably requested by RRG.

72.     RRG is informed and believes and thereupon alleges that KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN have each individually breached the AGREEMENT by failing to appear at least three (3) times per calendar year at a studio located in Los Angeles, California area to participate in the production of video recordings, photographs and other promotional materials as reasonably requested by RRG to promote the KARDASHIAN KARD and by failing to participate in at least two (2) of the sessions together.

73.     RRG is informed and believes and thereupon alleges that KIM KARDASHIAN, KHLOE KARDASHIAN, and KOURTNEY KARDASHIAN have each individually breached the AGREEMENT by failing to make at least three (3) public appearances each calendar year to promote the KARDASHIAN KARD, as reasonably requested by RRG and by failing to participate in at least two (2) of the sessions together.

74.     RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS breached the AGREEMENT by failing to actively and regularly market the KARDASHIAN KARD in all forums available to them including, but not limited to, Twitter, Facebook, blogs, QVC, reality television programs, talk and/or entertainment shows, news shows, morning shows, specials and live shows, radio programs, personal appearances, events, press conferences, articles, magazines, websites, and by failing to link the KARDASHIAN KARD to their websites.

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
16

Exhibit C

75. RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS breached the AGREEMENT by failing to provide RRG with contact information for all authorized KARDASHIAN distributors and to actively promote the KARDASHIAN KARD with its distributors and others to purchase other products, including KARDASHIAN-endorsed products.

76. RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS breached the AGREEMENT by failing to properly serve RRG with notice of their intent to terminate the AGREEMENT prior to providing notice to the national press.

77. RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS wrongfully breached the AGREEMENT by failing to properly provide RRG with thirty (30) days notice of their intent to terminate the AGREEMENT.

78. RRG is informed and believes and thereupon alleges that DASH and/or the KARDASHIANS wrongfully breached the AGREEMENT because RRG has not been adjudicated to be insolvent or declared bankruptcy, or failed to pay the KARDASHIANS any amount due pursuant to the AGREEMENT.

79. RRG has requested that DASH and/or the KARDASHIANS perform their obligations under the AGREEMENT. DASH and/or the KARDASHIANS have failed and refused to perform their contractual obligations under the AGREEMENT. Further, DASH and/or the KARDASHIANS have failed and refused to return RRG's Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) as DASH and/or the KARDASHIANS represented to RRG and the world that they would do in their November 29, 2010, termination letter.

80. RRG is informed and believes and thereupon alleges that the KARDASHIANS are individually liable for the above referenced breaches of contract due to their treatment of DASH as their alter ego entity and their misuse of the corporate shield by way of refusing to fulfill their obligations owed to RRG under the AGREEMENT for personal, non-business, and non-contractual reasons and are now attempting to hide behind the corporate shield for purposes of limiting individual liability for their actions.

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

81.     As a direct and proximate cause of the KARDASHIANS and/or DASH'S multiple breaches of the AGREEMENT, RRG has suffered damages in an amount to be proven at the time of trial, but believed to be no less than Seventy-Five Million Dollars ($75,000,000.00).

## SECOND CAUSE OF ACTION

### (Breach of Contract "LAUNCH AGREEMENT" Against the KARDASHIANS)

82.     RRG incorporates by reference each and every allegation contained in paragraph 1 through 21, 27, 29, 31 through 39, and 46 through 49 of this Verified Complaint as though fully set forth herein.

83.     Pursuant to the LAUNCH AGREEMENT, the KARDASHIANS were contractually obligated to appear together at PACHA and remain in the club for the launch of the KARDASHIAN KARD for a period of time no less than three (3) hours.

84.     Pursuant to the LAUNCH AGREEMENT, RRG was contractually obligated to pay for the promotion and launch of the KARDASHIAN KARD. RRG performed its contractual obligation by paying no less than Sixty-Five Thousand Dollars ($65,000.00) for the promotion and launch of the KARDASHIAN KARD at club PACHA.

85.     RRG has performed all conditions, covenants and promises required by it on its part to be performed in accordance with the terms and conditions of the LAUNCH AGREEMENT except those conditions, covenants, or promises which have been prevented or excused by the actions of the KARDASHIANS.

86.     RRG is informed and believes and thereupon alleges that the KARDASHIANS breached the LAUNCH AGREEMENT by leaving PACHA after only fifty-five (55) minutes and returning to stay an additional forty (40) minutes, for a total of one (1) hour and thirty-five (35) minutes, upon the demand of RRG.

87.     As a direct and proximate cause of the KARDASHIANS breach of the LAUNCH AGREEMENT, RRG has suffered damages in an amount to be proven at the time of trial, but believed to be no less than Sixty-Five Thousand Dollars ($65,000.00).

///

///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

1

## **THIRD CAUSE OF ACTION**

2

**(Breach of Covenant of Good Faith and Fair Dealing Against DEFENDANTS)**

3    88.    RRG incorporates by reference each and every allegation contained in

4  paragraph 1 through 87 in this Verified Complaint as though fully set forth herein.

5    89.    DEFENDANTS, and each of them, promised and agreed in the

6  AGREEMENT and the LAUNCH AGREEMENT to perform their contractual obligations.

7  DEFENDANTS, and each of them, had a duty to act in good faith and in accordance with the terms

8  of the AGREEMENT and the LAUNCH AGREEMENT.

9    90.    RRG is informed and believes and thereupon alleges that the DEFENDANTS

10  breached their duty of good faith and fair dealing by acting arbitrarily and in bad-faith in purposely

11  failing to fully comply with the terms of the AGREEMENT and the LAUNCH AGREEMENT and

12  by publically wrongfully terminating the AGREEMENT on false grounds.

13    91.    As a direct and proximate cause of the DEFENDANTS' breach of the implied

14  covenant of good faith and fair dealing, as alleged above, RRG has suffered damages and continues

15  to suffer damages in an amount to be proven at trial, but believed to be no less than Seventy-Five

16  Million Dollars ($75,000,000.00), which is the amount RRG would have generated but for the

17  DEFENDANTS' breach.

18

## **FOURTH CAUSE OF ACTION**

19

**(Negligent Misrepresentation Against The KARDASHIANS And
DASH For The AGREEMENT)**

20

21    92.    RRG incorporates by reference each and every allegation contained in

22  paragraph 1 through 45, and 50 through 81 of this Verified Complaint as though fully set forth

23  herein.

24  ///

25  ///

26  ///

27  ///

28  ///

Exhibit C

93.     RRG is informed and believes and thereupon alleges that at all times mentioned herein, the KARDASHIANS and/or DASH, had the duty to truthfully disclose all known material facts regarding their true intentions in entering into the AGREEMENT prior to entering into the AGREEMENT. RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH had a duty to make a reasonable inquiry into their ability and/or desire to perform the terms under the AGREEMENT before committing to the AGREEMENT, even if the facts and/or information was not available to them at the time they made the representation.

94.     RRG is informed and believes and thereupon alleges that at all times mentioned herein, the representations made by the KARDASHIANS and/or DASH, in entering into the AGREEMENT were untrue in that the KARDASHIANS unjustly publically terminated the AGREEMENT and had no intention of fulfilling their obligations under the terms of the AGREEMENT.

95.     RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH breached their duty to make reasonable inquiries and to exercise reasonable diligence to discover if they would be performing under the AGREEMENT prior to entering into the AGREEMENT. The KARDASHIANS and/or DASH breached their duty to truthfully disclose all known material facts and/or discover facts not known to RRG which constitutes negligent misrepresentation to RRG.

96.     RRG relied on each of the KARDASHIANS and/or KRIS JENNER's negligent representations and were induced by the negligent representations to enter into the AGREEMENT and into spending no less than Five Hundred Thousand Dollars ($500,000.00) for the creation, promotion and launch of the KARDASHIAN KARD.   RRG believed the representations of the KARDASHIANS and/or DASH to be reasonable and true.

97.     RRG is informed and believes and thereupon alleges that based upon the KARDASHIANS and/or DASH's breach of their duty to make reasonable inquiries and exercise reasonable diligence to discover the true facts regarding the KARDASHIANS intentions to perform under the AGREEMENT, the KARDASHIANS and/or KRIS JENNER were the actual cause of the damages suffered by RRG.

Exhibit C

98.     As a proximate result of the KARDASHIANS and/or KRIS JENNER's negligent actions(s), RRG has suffered damages in an amount to be proven at trial, but not less than Seventy-Five Million Dollars ($75,000,000.00).

## FIFTH CAUSE OF ACTION

**(Negligent Misrepresentation Against The KARDASHIANS
and KRIS JENNER For The Launch Agreement)**

99.     RRG incorporates by reference each and every allegation contained in paragraph 1 through 14, 20 through 21, 27, 29, 31 through 39, 46 through 49 and 82 through 87 of this Verified Complaint as though fully set forth herein.

100.    RRG is informed and believes and thereupon alleges that at all times mentioned herein, the KARDASHIANS and/or KRIS JENNER, had the duty to truthfully disclose all known material facts regarding their true intentions in entering into the LAUNCH AGREEMENT prior to entering into the LAUNCH AGREEMENT. RRG is informed and believes and thereupon alleges that KRIS JENNER had a duty to truthfully disclose all material facts regarding the KARDASHIANS intent to fulfill their obligations under the LAUNCH AGREEMENT prior to committing the KARDASHIANS to appear at the launch of the KARDASHIAN KARD at PACHA.

101.    RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or KRIS JENNER had a duty to make a reasonable inquiry into the schedule of KIM KARDASHIAN, KHLOE KARDASHIAN and KOURTNEY KARDASHIAN and their availability to remain at PACHA for the contractual period of three (3) hours before confirming KIM KARDASHIAN, KHLOE , and KOURTNEY KARDASHIAN's appearance at the launch of the KARDASHIAN KARD at PACHA, even if the facts and/or information were not available to her at the time she made the representation.  In sum, KRIS JENNER as the manager and agent for the KARDASHIANS, was negligent by contractually committing the KARDASHIANS to appear at PACHA for the launch and promotion of the KARDASHIAN KARD for three (3) hours.

///

///

///

Exhibit C

102.   RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or KRIS JENNER breached their duty to make reasonable inquiries and to exercise reasonable diligence to discover whether the KARDASHIANS would be performing under the LAUNCH AGREEMENT prior to giving RRG approval for the promotion and launch of the KARDASHIAN KARD.  The KARDASHIANS and/or DASH breached their duty to truthfully disclose all known material facts and/or discover facts not known to RRG which constitutes negligent misrepresentation to RRG.

103.   RRG relied on each of the KARDASHIANS and/or KRIS JENNER's negligent representations and were induced by the negligent representations to enter into the LAUNCH AGREEMENT and into spending money for the promotion and launch of the KARDASHIAN KARD at PACHA.  RRG believed the representations of the KARDASHIANS and/or KRIS JENNER to be reasonable and true.

104.   RRG is informed and believes and thereupon alleges that based upon the KARDASHIANS and/or KRIS JENNER's breach of their duty to make reasonable inquiries and exercise reasonable diligence to discover the true facts regarding the KARDASHIANS intentions to perform under the LAUNCH AGREEMENT, the KARDASHIANS and/or KRIS JENNER were the actual cause of the damages suffered by RRG.

105.   As a proximate result of the KARDASHIANS and/or KRIS JENNER's negligent actions(s), RRG has suffered damages in an amount to be proven at trial, but not less than Sixty-Five Thousand Dollars ($65,000.00).

## SIXTH CAUSE OF ACTION

**(Negligent Interference With Prospective Economic Advantage Against DEFENDANTS)**

106.   RRG incorporates by reference each and every allegation contained in paragraph 1 through 105 of this Verified Complaint as though fully set forth herein.

///

///

///

///

Exhibit C

1    107.    RRG is informed and believes and thereupon alleges that the DEFENDANTS,

2  and each of them, were aware of the economic benefit of the AGREEMENT to RRG.

3  DEFENDANTS, and each of them, knew that their actions would interfere with RRG's attempts to

4  promote and manage the KARDASHIAN KARD, operate RRG, and develop and enter into

5  agreements with other entities and/or celebrities for customized prepaid debit cards. Further, RRG

6  is informed and believes and thereupon alleges that the DEFENDANTS, and each of them, knew or

7  should have known that their actions would interfere with RRG's ISO with University National

8  Bank. RRG is informed and believes and thereupon alleges that the DEFENDANTS knew or should

9  have known that their actions in wrongfully publically terminating the AGREEMENT would cause

10  RRG to lose in whole or part the probable economic benefit or advantage of the AGREEMENT and

11  the ordinary course of business engaged into by RRG.

12    108.    RRG is informed and believes and thereupon alleges that DEFENDANTS,

13  and each of them, negligently and carelessly interfered with such economic relationships by, inter

14  alia, failing to perform under the AGREEMENT, and breaching the AGREEMENT as more fully

15  set forth above, and causing RRG to wrongfully suffer public ridicule and lose its ISO and ability

16  to conduct business.  As set forth herein, the actions of the DEFENDANTS were illegal, wrongful

17  and, among other things, constituted bad faith conduct which encompasses all of the allegations set

18  forth herein.

19    109.    As a proximate result of the DEFENDANTS' negligent interference with

20  RRG's economic benefit of the AGREEMENT, RRG has been damaged in an amount to be proven

21  at trial, but presently believed to be in excess of Seventy-Five Million Dollars ($75,000,000.00),

22  from the loss of business and loss of profits.

23                           **SEVENTH CAUSE OF ACTION**

24             **(Unjust Enrichment Against the KARDASHIANS and DASH)**

25    110.    RRG incorporates by reference each and every allegation contained in

26  paragraph 1 through 44, 53 through 81, 92 through 98, and 106 through 109 of this Verified

27  Complaint as though fully set forth herein.

28  ///

Exhibit C

111.    As set forth above, the KARDASHIANS and/or DASH have received a financial benefit from RRG totaling Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) from the receipt of the Initial Deposit after the execution of the AGREEMENT, as well as increased media attention derived from their connection to the KARDASHIAN KARD.  Further, RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH intended to breach the remainder of the AGREEMENT and attempted to terminate the AGREEMENT under false pretenses, thereby causing RRG damages in an amount to be determined at trial, but not less than Thirty-Seven Thousand Five Hundred Dollars ($37,500.00).

112.    The KARDASHIANS and/or DASH represented to RRG and the public in their November 29, 2010, termination letter, that the KARDASHIANS would be returning the Initial Deposit paid by RRG, but has wrongfully failed to return the Initial Deposit.  Further, RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH will continue to engage in actions to prevent RRG from performing under the AGREEMENT and conducting ordinary business. RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH will continue to wrongfully benefit from the use of RRG's Initial Deposit and media attention surrounding their wrongful and public breach of the AGREEMENT.

113.    As a direct and proximate cause of the KARDASHIANS and/or DASH wrongful conduct by their failure to return the monies rightfully owed to RRG, refusal to allow RRG to promote and advertise the KARDASHIAN KARD, and perform under the AGREEMENT, the KARDASHIANS and/or DASH have been unjustly enriched. As such, RRG seeks restitution in the amount to be determined at trial, but not less than Three Hundred Thousand Dollars ($300,000.00).

## EIGHTH CAUSE OF ACTION

### (Constructive Trust Against The KARDASHIANS and DASH)

114.    RRG incorporates by reference each and every allegation contained in paragraph 1 through 44, 53 through 81, 92 through 98, and 106 through 109 of this Verified Complaint as though fully set forth herein.

///

Exhibit C

115.   By way of the AGREEMENT, the KARDASHIANS and/or DASH received a benefit from RRG by receiving the Initial Deposit in the amount of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00).

116.   By way of the AGREEMENT, the KARDASHIANS and/or DASH have received a benefit from RRG by possessing the Initial Deposit and continuing to operate DASH for a profit.

117.   The KARDASHIANS and/or DASH's retention of all of the monies submitted to them by RRG, as well as the profits derived from the operation of DASH is done with the benefit to the KARDASHIANS and/or DASH and to the detriment of RRG as well, as RRG's financial position.

118.   The KARDASHIANS and/or DASH have received an unjust enrichment from RRG at RRG's expense.

119.   An imposition of a constructive trust is necessary and proper in this matter because the KARDASHIANS and/or DASH have been unjustly enriched.

**TENTH CAUSE OF ACTION**

**(Accounting Against The KARDASHIANS and DASH)**

120.   RRG incorporates by reference each and every allegation contained in paragraph 1 through 44, 53 through 81, 92 through 98, and 106 through 109 of this Verified Complaint as though fully set forth herein.

///
///
///
///
///
///
///
///
///

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
25

Exhibit C

121.    On or about June 16, 2010, RRG and the KARDASHIANS and/or DASH entered into the AGREEMENT and on June 17, 2010, RRG paid to the KARDASHIANS and/or DASH the Initial Deposit of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00).  The KARDASHIANS and/or DASH received a profit from the monies received from RRG and have failed to account for such monies and profit to RRG.  RRG is informed and believes and thereupon alleges that the KARDASHIANS and/or DASH have used the money submitted by RRG for the funding of other financial ventures undertaken by DASH.  Since November 29, 2010, RRG has expected the return of the Initial Deposit from the KARDASHIANS and/or DASH as represented by the KARDASHIANS and/or DASH in their termination letter, but the KARDASHIANS and/or DASH have failed and refused to fulfil their promise and repay RRG the monies owed.

122.    The amount of the payments owed to RRG is unknown to RRG and can only be determined by an accounting of the receipts for the profits and/or losses from DASH.  RRG is informed and believes and thereupon alleges that the amount due to RRG is an amount to be determined at trial, but within the jurisdictional limits of this court.

**WHEREFORE, RRG prays for judgment against, DEFENDANTS, and each of them, as follows:**

**ON THE FIRST CAUSE OF ACTION (Breach of Contract "AGREEMENT"):**

1.    For compensatory damages in an amount according to proof at trial, but believed to be no less than Seventy-Five Million Dollars ($75,000,000.00);

2.    For consequential damages in an amount according to proof at trial;

3.    For legal interest at the maximum rate of ten percent (10%) per annum from November 29, 2010, to the date of entry of judgment;

4.    For legal interest at the maximum rate from the date of entry of judgment until such time as the judgment is paid in full;

5.    For reasonable attorneys' fees and costs according to proof;

6.    For such other and further relief as the court may deem proper.

///

///

Exhibit C

**ON THE SECOND CAUSE OF ACTION (Breach of Contract " LAUNCH AGREEMENT"):**

    1.    For compensatory damages in an amount according to proof at trial, but believed to be no less than Sixty-Five Thousand Dollars ($65,000.00);

    2.    For consequential damages in an amount according to proof at trial;

    3.    For legal interest at the maximum rate of ten percent (10%) per annum from November 9, 2010, to the date of entry of judgment;

    4.    For legal interest at the maximum rate from the date of entry of judgment until such time as the judgment is paid in full;

    5.    For reasonable attorneys' fees and costs according to proof;

    6.    For such other and further relief as the court may deem proper.

**ON THE THIRD CAUSE OF ACTION (Breach of Covenant of Good Faith and Fair Dealing):**

    1.    For recovery for damages RRG suffered and continues to suffer in an amount according to proof at trial, but believed to be no less than Seventy-Five Million Dollars ($75,000,000.00);

    2.    For legal interest at the maximum rate of ten percent (10%) per annum from November 29, 2010, to the date of entry of judgment;

    3.    For legal interest at the maximum rate from the date of entry of judgment until such time as the judgment is paid in full;

    4.    For reasonable attorneys' fees and costs according to proof;

    5.    For such other and further relief as the court may deem proper.

**ON THE FOURTH CAUSE OF ACTION (Negligent Misrepresentation "AGREEMENT"):**

    1.    For damages in an amount according to proof at trial, but believed to be no less than Seventy-Five Million Dollars ($75,000,000.00);

    2.    For general damages in an amount according to proof at trial, but no less than Five Hundred Thousand Dollars ($500,000.00);

    3.    For legal interest at the maximum rate of ten percent (10%) per annum from November 29, 2010, to the date of entry of judgment;

///

Exhibit C

1    4.    For legal interest at the maximum rate from the date of entry of judgment

2          until such time as the judgment is paid in full;

3    5.    For reasonable attorneys' fees and costs according to proof;

4    6.    For such other and further relief as the court may deem proper.

5    **ON THE FIFTH CAUSE OF ACTION (Negligent Misrepresentation "LAUNCH**

6    **AGREEMENT"):**

7    1.    For damages in an amount according to proof at trial, but believed to be no

8          less than Sixty-Five Thousand Dollars ($65,000.00);

9    2.    For general damages in an amount according to proof at trial, but believed to

10         be no less than Sixty-Five Thousand Dollars ($65,000.00);

11   3.    For legal interest at the maximum rate of ten percent (10%) per annum from

12         November 9, 2010, to the date of entry of judgment;

13   4.    For legal interest at the maximum rate from the date of entry of judgment

14         until such time as the judgment is paid in full;

15   5.    For reasonable attorneys' fees and costs according to proof;

16   6.    For such other and further relief as the court may deem proper.

17   **ON THE SIXTH CAUSE OF ACTION (Negligent Interference With Prospective Economic**

18   **Advantage):**

19   1.    For damages in an amount according to proof at trial, but believed to be no

20         less than Seventy-Five Million Dollars ($75,000,000.00);

21   2.    For legal interest at the maximum rate of ten percent (10%) per annum from

22         November 29, 2010, to the date of entry of judgment;

23   3.    For legal interest at the maximum rate from the date of entry of judgment

24         until such time as the judgment is paid in full;

25   4.    For reasonable attorneys' fees and costs according to proof;

26   5.    For such other and further relief as the court may deem proper.

27   ///

28   ///

Exhibit C

**ON THE SEVENTH CAUSE OF ACTION (Unjust Enrichment):**

1.  For restitution in an amount according to proof at trial, but believed to be no less than Thirty-Seven Thousand Five Hundred Dollars ($37.500.00) for the consideration paid by RRG;

2.  For the sum that has been paid or will be paid by RRG for the losses incurred from the KARDASHIANS and/or DASH's action in an amount according to proof at trial, but believed to be no less than Three Hundred Thousand Dollars ($300,000.00);

3.  For legal interest at the maximum rate of ten percent (10%) per annum from November 29, 2010, to the date of entry of judgment;

4.  For legal interest at the maximum rate from the date of entry of judgment until such time as the judgment is paid in full;

5.  For reasonable attorneys' fees and costs according to proof;

6.  For such other and further relief as the court may deem proper.

**ON THE EIGHTH CAUSE OF ACTION (Constructive Trust):**

1.  For an order compelling the KARDASHIANS and/or DASH to hold all monies received from RRG in trust for RRG;

2.  For an order compelling the KARDASHIANS and/or DASH to return any monies received from RRG to RRG;

3.  For reasonable attorneys' fees and costs according to proof;

4.  For such other and further relief as the court may deem proper.

**ON THE NINTH CAUSE OF ACTION (Accounting):**

1.  For an order compelling the KARDASHIANS and/or DASH to hold all monies received from RRG in trust for RRG;

2.  For an order compelling the KARDASHIANS and/or DASH to return any monies received from RRG to RRG;

3.  For an accounting of all monies owed to RRG from June 17, 2010, to the date of entry of judgment;

Exhibit C

1      4.     The damages in the amount of no less than Thirty Seven Thousand Five

2             Hundred Dollars ($37,500.00) owed to RRG;

3      5.     For reasonable attorneys' fees and costs according to proof;

4      6.     For such other and further relief as the court may deem proper.

5

6   DATED:  January 6, 2011                 **MILLER & AYALA, LLP**

7

8

9                                   Christopher L. Rudd
                                     Nathan S. Miller

10                               Mary Castro-Ayala
                               Attorneys for PLAINTIFF

11                             **THE REVENUE RESOURCE GROUP, LLC, dba MOBILE**

12                             **RESOURCE GROUP**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

VERIFIED COMPLAINT FOR DAMAGES
30

Exhibit C

1

## VERIFICATION

2

3          I, NANCY TOROSIAN, am the Chief Operating Officer of THE REVENUE

4   RESOURCE GROUP, LLC, dba MOBILE RESOURCE CARD, and am authorized by the

5   corporation to execute this verification and I declare as follows:

6          I have read the foregoing VERIFIED COMPLAINT FOR DAMAGES and know the

7   contents therein. THE REVENUE RESOURCE GROUP, LLC, dba MOBILE RESOURCE CARD

8   is a party to this action. The matters stated in the foregoing document are true and correct as to my

9   own knowledge except as to those matters which are stated on information and belief, and as to those

10  matters I believe them to be true.

11         Executed on January 6, 2011, at Fresno, California. I declare under penalty of perjury

12  that the foregoing is true and correct.

13

14

15                                              Nancy Torosian
                                                Chief Operating Officer for THE REVENUE
16                                              RESOURCE GROUP, LLC, dba MOBILE
                                                RESOURCE CARD

17

18

19

20

21

22

23

24

25

26

27

28

MILLER & AYALA, LLP
191 W. Shaw Ave., #102
Fresno, CA 93704
(559) 222-6622

Exhibit C

VERIFIED COMPLAINT FOR DAMAGES
31

# EXHIBIT "A"

Exhibit C

## CELEBRITY ENDORSEMENT AGREEMENT

THIS CELEBRITY ENDORSEMENT AGREEMENT ("Agreement") is entered into on _____ June 16, 2010 _____ by and between DASH DOLLS, LLC, a California limited liability corporation, representing KOURTNEY MARY KARDASHIAN, KIMBERLY NOEL 'KIM' KARDASHIAN and KHLOE ALEXANDRA KARDASHIAN ODOM (individually "Kardashian" or collectively "Kardashians") and THE REVENUE RESOURCE GROUP, LLC, ("RRG"), a California limited liability corporation.

## RECITALS

A.   The Kardashians, and each of them, are recognized and widely known throughout the world as celebrities.

B.   By virtue of Kardashians' ability and experience, their names have acquired a meaning that may be important to the advertising, promotion, and sale of services and merchandise.

C.   RRG manufactures, distributes and sells a customized MasterCard prepaid debit card program.

D.   RRG desires to acquire the exclusive right and license to utilize the Kardashians names, nicknames, initials, autographs, facsimile signatures, photographs, likenesses, and endorsements ("Property") in connection with the marketing and sale of MasterCard prepaid debit cards in the name of Kardashians ("Product"). Kardashians are willing to grant such right and license.

## AGREEMENT

In consideration of their mutual covenants, the parties agree as follows:

1.   Grant Of Rights.  Subject to the terms and conditions of this Agreement, the Kardashians, and each of them, grant to RRG the exclusive and worldwide ("Territory") right and license to use the Property to market, advertise, promote, and sell the Product, in any manner, as determined by RRG, at its discretion.

2.   Term; Approval.  This Agreement shall be binding from the date of execution and shall continue for a term of two (2) years ("Initial Term"). The parties may renew this Agreement for an unlimited number of additional terms of one (1) year each, upon mutual agreement of the parties.

1

Exhibit C

3.    Royalties; Advance Royalties.

A.    On behalf of the Kardashians, RRG agrees to pay to DASH DOLLS, LLC, a California limited liability corporation, the sum of Three Dollar ($3.00) for each Product activated or sold during a Royalty Period, and for which RRG is actually paid ("Monthly Royalty") based on the monthly maintenance fee of Seven Dollars and Ninety-Five Cents ($7.95) and twenty-five percent (25%) of the usage or transaction fees RRG receives from the financial institution during the Royalty Period ("Transaction Royalty"), (collectively "Royalty" or "Royalties").

B.    RRG agrees to pay to DASH DOLLS, LLC, a California limited liability corporation, the sum of Seventy-Five Thousand Dollars ($75,000.00), as an advance on the Royalties as follows.  Upon the signing of this Agreement, RRG agrees to pay the sum of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) ("Initial Deposit"), made payable to DASH DOLLS, LLC, a California limited liability corporation.  Six (6) months after the signing date of this Agreement, RRG agrees to pay to DASH DOLLS, LLC, a California limited liability corporation, an additional advance of Thirty-Seven Thousand Five Hundred Dollars ($37,500.00) ("Additional Deposit"). The Initial and Additional Deposits shall be credited against Royalties earned by Kardashians. The parties agree that Kardashians will receive Royalty payments only when the Royalties they earn exceed the Initial and Additional Deposits.  The Deposits, Initial and Additional, are recoupable against Royalties, but not refundable if not recouped.

C.    The Royalties shall be calculated at the end of each calendar month ("Royalty Period"), commencing the Royalty Period immediately following the Product Official Launch Date and shall be calculated each Royalty Period thereafter and shall be payable no later than twenty-five (25) days after the end of the Royalty Period. For each Royalty Period, RRG shall provide a written statement, supplied by the financial institution, summarizing the debit cards issued and activated and summarizing the transaction fees received by RRG. All payments to DASH DOLLS, LLC, a California limited liability corporation, shall be made in U.S. currency and by wire transfer or as otherwise directed by the Kardashians.

D.    If RRG obtains the endorsement of any other celebrity related to the Product, RRG agrees to pay the Kardashians no less than the royalties RRG agrees to pay any other celebrity to promote the Product.

E.    Kardashians acknowledge that each customer will pay an initial fee of about Nine Dollars and Ninety-Five Cents ($9.95) ("Set Up Fee") and that they will not receive a Royalty on any Set Up Fees paid.

F.    Kardashians acknowledge and agree that the financial institution, the processor and others will receive a portion of fees paid by customers, including a portion of the Set Up Fees, and that Kardashians agree that Royalties will be payable to them only on fees paid to RRG, (not including Set Up Fees).

2

Exhibit C

4.    Personal Appearances.

A.    Kardashians, and each of them, agree to be available for, to cooperate in and to participate in photo sessions, marketing, advertising, publicity, interviews and similar activities related to the Product, as reasonably requested by RRG.

B.    Kardashians, and each of them, agree to appear at least three (3) times a calendar year at a studio located in the Los Angeles, California, area to participate in the production of video recordings, photographs and other promotional materials, as reasonably requested and scheduled by RRG. These sessions shall last no longer than eight (8) hours each. Kardashians agree that, for at least two (2) of these sessions, all Kardashians will participate together.

C.    Kardashians, and each of them, agree to make at least three (3) public appearances each calendar year to promote the Product, as reasonably requested and scheduled by RRG. The public appearances shall last no longer than eight (8) hours each. The Kardashians agree to appear together for at least two (2) of these appearances.

D.    Kardashians agree to participate in these sessions and appearances only after a thirty (30) day notice and acceptance of the session or appearance. All expenses are to be submitted and approved by RRG, in writing, prior to any session or appearance. No other compensation shall be paid to Kardashians for the sessions or appearances.

5.    Marketing. Kardashians, and each of them, agree to actively and regularly market the Product in all forums available to them to include, but not limited to: Twitter, Facebook, blogs, QVC, reality television programs, talk and or entertainment shows, news shows, morning shows, specials and live shows, radio programs, personal appearances, events, press conferences, articles, magazines, websites, and other mediums that may not yet be developed. Kardashians, and each of them, agree to "tweet" about the Product and to mention the Product on Facebook. Kardashians, and each of them, agree to place a link to the Product on their websites 'above the fold' on the principal landing page, in a size to be agreed upon, but not smaller than 180 x 150 pixels surrounded by graphics. The link is to be operational and displayed on the principal landing page for viewing by all visitors all of the time, and related costs are to be paid by RRG.

6.    Distributors. Kardashians agree to provide to RRG contact information for all authorized Kardashian distributors and agree to actively promote with its distributors and others, the use of the Product to purchase other products, including Kardashian-endorsed products.

7.    Notices and Payments. Any notice required to be given pursuant to this Agreement shall be in writing and mailed to such address as designated in writing by the parties and shall be sent by certified or registered mail, return receipt requested, or by a national overnight express service.

3

Exhibit C

8.    Inspections. Kardashians, or their representatives may, upon reasonable notice, at their own expense, inspect RRG's books and records in order to verify the accuracy of the calculation of the Royalties. If Kardashians discover an underpayment of Royalties, RRG agrees to immediately pay the Royalties due, plus interest at the annual rate of ten percent (10%), commencing from the date the Royalties should have been paid. RRG agrees to retain its books and records for at least two (2) years after termination of the Agreement.

9.    Reservation of Rights.    Except as described in this Agreement, Kardashians shall retain all rights in and to the Property and may license the Property for advertisement, promotion, and sale of any product or service, except those products and services that are substantially similar or related to the Product. For purposes of this Agreement, credit cards, prepaid debit cards, debit cards and all related financial products or services shall be considered to be substantially similar to and related to the Product.

10.    Representations, Warranties.

A.    Kardashians and DASH DOLLS, LLC, a California limited liability corporation, represent and warrant that they have not granted nor will they grant to any other party any right, permission, or license to use the Property in connection with the advertisement, sale, or promotion of the Product or in connection with products or services that are substantially similar to or related to the Product.

B.    Kardashians and DASH DOLLS, LLC, a California limited liability corporation, represent and warrant they have the full and exclusive right, power, and authority to license the Property.

C.    Kardashians and DASH DOLLS, LLC, a California limited liability corporation, represent and warrant that they have not misrepresented or concealed any material information about the Kardashians, including their background, that may be prejudicial to or reduce the value of the Property or endorsement; that the Kardashians are in good physical and mental health; that the Kardashians will not retire during the term of this Agreement; and that Kardashians have not or will not engage in any activity, criminal or otherwise, that may negatively impact the Product.

11.    Indemnity.

A.    RRG agrees to defend, indemnify, and hold Kardashians harmless against all costs, expenses, and losses (including reasonable attorney fees and costs) arising from the manufacture or sale of the Product.

B.    Kardashians and DASH DOLLS, LLC, a California limited liability corporation, agree to defend, indemnify, and hold RRG and its officers, directors, agents, and employees, harmless against all costs, expenses, and losses (including reasonable attorney fees and costs) arising from a breach by Kardashians or by DASH DOLLS, LLC, a California limited liability corporation, including claims arising from the claims

4

Exhibit C

of others that the use of the Property infringes on the rights of others.

12.    Product Costs.  RRG agrees to pay all financial costs associated with the creation, launch, promotion and management of the Product.

13.    Breach.  If Kardashians or DASH DOLLS, LLC, a California limited liability corporation, fail to perform the terms of this Agreement or impede the launch or marketing of the Product, in any way, Kardashians agree to indemnify, defend and hold RRG harmless from any damages for costs, expenses, and losses (including reasonable attorney fees and costs) arising from the acts or omissions of Kardashians or DASH DOLLS, LLC, a California limited liability corporation.

14.    Compliance.  Kardashians agree to comply with all MasterCard rules and regulations in the use and or promotion of the Product.

15.    Product Liability Insurance.  RRG agrees to obtain and maintain, for the Term, at its own expense, a product liability insurance policy, issued by an insurance company licensed to do business in California and having an AM Best rating of B+ or better, naming Kardashians as additional insureds. The policy shall provide protection against all claims, demands, and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Product or arising from any material used in connection with the Product. The coverage shall be no less than Two Million Dollars ($2,000,000.00) per occurrence, with a maximum aggregate coverage of Four Million Dollars ($4,000,000.00), and an excess umbrella coverage of One Million Dollars ($1,000,000.00) with no deductible. The policy shall provide for thirty (30) days' notice to Kardashians in the event of any modification, cancellation, or termination thereof. RRG agrees to furnish a certificate of insurance evidencing such insurance prior to the manufacture, distribution, or sale of the Product.

16.    Confidential Information.

A.    The parties agree that RRG will disclose to Kardashians and to DASH DOLLS, LLC, a California limited liability corporation, confidential information related to the Product. Kardashians and DASH DOLLS, LLC, a limited liability corporation, agree they will not use or disclose to others, without RRG's written consent, RRG's confidential information, except when reasonably necessary to perform the terms of this Agreement. "Confidential information" includes, but is not limited to:

(1)    Written, printed, graphic or electronically recorded materials furnished by RRG for use by Kardashians.
(2)    Business plans, vendor lists, customer lists, operating procedures, trade secrets, design formulas, know-how and processes, computer programs and inventories, discoveries and improvements of any kind.
(3)    Any written or tangible information stamped "confidential," "proprietary" or with a similar legend.

5

Exhibit C

(4)     Any written or tangible information not marked with a confidentiality legend, or information disclosed orally to Kardashians that is treated as confidential by RRG.

B.     Confidential Information shall not include any material publicly available, or known to Kardashians without restriction, or which is lawfully obtained by Kardashians from sources other than RRG.

C.     Kardashians' obligations regarding proprietary or confidential information extend to information belonging to RRG customers, suppliers or insurers about whom Kardashians may have gained knowledge as a result of Kardashians' participation in the Product.

D.     The provisions of this paragraph will survive the termination of this Agreement.

17.     Termination.

A.     Kardashians may terminate this Agreement upon thirty (30) days prior written notice to RRG if RRG is adjudicated insolvent or declares bankruptcy, fails to pay to Kardashians any amount due pursuant to this Agreement within sixty (60) days of the due date of the payment or fails to maintain product liability insurance as herein provided.

B.     RRG may terminate this Agreement upon thirty (30) days prior written notice to Kardashians if Kardashians, or any of them, engage in illegal, immoral, or criminal conduct, engage in conduct contrary to the best interests of the Product or RRG, as determined by RRG in its discretion, retire from the entertainment industry or misrepresent or conceal any information about Kardashians that RRG determines, in its discretion, materially and adversely affects the Product.

18.     Post-Termination.

A.     Not less than forty-five days prior to the expiration of this Agreement, RRG shall provide Kardashians with a summary of all Product manufactured or ordered prior to the termination of the Agreement ("Inventory").

B.     Kardashians agree that RRG may, for three (3) months following the termination of this Agreement, market and sell the Inventory and may, subject to the terms of the Agreement, use the Property in connection with such marketing and sales.

C.     Upon the termination of this Agreement, all rights granted to RRG under this Agreement shall terminate and RRG shall discontinue all use of and reference to the Property, except as otherwise described in the Agreement.

D.     If this Agreement is terminated for any reason other than the breach of the

6

Exhibit C

Kardashians, RRG agrees to pay Royalties accruing after the termination of the Agreement, for so long as RRG receives revenue from the Product. If the Agreement is terminated because of a breach by Kardashians, RRG is not obligated to pay to Kardashians any Royalties arising after the breach.

19.     Relationship. Kardashians and DASH DOLLS, LLC, a limited liability corporation, are independent contractors relative to RRG. Accordingly, nothing in this Agreement shall be construed to establish an employer-employee, partnership, or joint venture relationship between the RRG and the Kardashians or DASH DOLLS. LLC, a California limited liability corporation.

20.     Force Majeure. Neither party will be liable for, or will be considered to be in default under this Agreement on account of any delay or failure to perform because of any cause or condition beyond the party's reasonable control and that the party is unable to overcome through the exercise of commercially reasonable diligence. If any such force majeure event occurs, the affected party will give prompt written notice to the other party and will use commercially reasonable efforts to minimize the impact of the event.

21.     Jurisdiction; Venue. This Agreement shall be governed by the laws of California. Any action to enforce or interpret the Agreement must be brought in Fresno, California.

22.     Agreement Binding On Successors; Joint and Several Responsibility. This Agreement shall be binding upon and shall inure to the benefit of the parties and their heirs, administrators, successors and assigns. The Kardashians and DASH DOLLS, LLC, a California limited liability corporation, agree that their responsibility under this Agreement shall be joint and several.

23.     Assignment. Neither party may assign this Agreement nor the rights and obligations there under without the prior express written approval of the other party.

24.     Waiver. No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

25.     Severability. If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity of any other provision and such invalid provision shall be deemed to be severed from the Agreement.

26.     Integration. This Agreement constitutes the entire understanding of the parties relative to the Property and the Product and supersedes all prior agreements between the parties and is intended as a final expression of their agreement. This Agreement shall not be amended except in writing signed by the parties.

27.     Attorneys' Fees; Costs. If any action is taken to interpret or enforce this Agreement, including litigation or arbitration, the prevailing party shall be entitled to recover from the non-prevailing party its reasonable expenses and costs, including

7

Exhibit C

reasonable attorneys' fees and post-judgment or post-decision enforcement, collection and appeal expenses. The term "non-prevailing party" shall include a party filing a voluntary dismissal of an action.

28. Agreement. Since the parties to this Celebrity Endorsement Agreement are located in various locations, it is agreed that all parties to the Agreement will print a hard copy of the Agreement and execute their respective signature page. The signature pages will be collected and joined to the original Agreement. The Agreement content, a total of twelve (12) pages (inclusive of the signature pages), has been reviewed and approved by Joseph Lehrer, Boulevard Management, 21731 Ventura Boulevard, Suite 300, Woodland Hills, CA 91364.

Signatories:

| | | |
|---|---|---|
| William Claude Butler | Manager | The Revenue Resource Group, LLC |
| Kourtney Mary Kardashian | Celebrity | Dash Dolls, LLC |
| Kimberly Noel 'Kim' Kardashian | Celebrity | Dash Dolls, LLC |
| Khloe Alexandra Kardashian Odom | Celebrity | Dash Dolls, LLC |

8

Exhibit C

Celebrity Endorsement Agreement

Between

The Revenue Resource Group, LLC and Dash Dolls, LLC

THE REVENUE RESOURCE GROUP, LLC
WILLIAM CLAUDE BUTLER, MANAGER

By: _William Claude Butler_

Exhibit C

Celebrity Endorsement Agreement

Between

The Revenue Resource Group, LLC and Dash Dolls, LLC


DASH DOLLS. LLC
KOURTNEY MARY KARDASHIAN


By: _____

10

# Exhibit C

Celebrity Endorsement Agreement

Between

The Revenue Resource Group, LLC and Dash Dolls, LLC

DASH DOLLS, LLC
KIMBERLY NOEL 'KIM' KARDASHIAN

By: _____

11

Exhibit C

Celebrity Endorsement Agreement

Between

The Revenue Resource Group, LLC and Dash Dolls, LLC

DASH DOLLS, LLC
KHLOE ALEXANDRA KARDASHIAN ODOM

By:

12

Exhibit C

# EXHIBIT "B"

Exhibit C

00195
Office All #

**CASHIER'S CHECK**

SERIAL #:  0019508539

ACCOUNT#:  4861-505295

Purchaser:  WILLIAM C BUTLER JR
Purchaser Account  0171406713
Operator I.D.  cu021049    cu021756

June 17, 2010

PAY TO THE ORDER OF     ***DASH DOLLS, LLC***

***Thirty-seven thousand five hundred dollars and no cents***          **$37,500.00**

WELLS FARGO BANK, N.A.
75 SHAW AVE
CLOVIS, CA 93612
FOR INQUIRIES CALL 1-800-394-3122

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND

VOID IF OVER US $  37,500.00

**NON-NEGOTIABLE**

**Purchaser Copy**

00195
Office All #

**CASHIER'S CHECK**

0019508539

Operator I.D.  cu021049    cu021756

PAY TO THE ORDER OF     ***DASH DOLLS, LLC***

June 17, 2010

***Thirty-seven thousand five hundred dollars and no cents***          **$37,500.00**

WELLS FARGO BANK, N.A.
75 SHAW AVE
CLOVIS, CA 93612
FOR INQUIRIES CALL 1-800-394-3122

VOID IF OVER US $  37,500.00

AUTHORIZED SIGNATURE

⑈0019508539⑈ ⑆121000248⑆4861 505295⑈

Exhibit C

# EXHIBIT "C"

Exhibit C

From: Nancy Torosian <nancy@securityassured.us>
Subject: **Kardashian Prepaid MasterCard Program**
Date: October 11, 2010 10:14:04 AM PDT
To: Lisandra DuFort <lisa@kardashianjenner.com>, Kira Costello <kcostello@apa-agency.com>

Hello Lisa,

Hope this Monday finds you well and ready for another big week!

I wanted to touch base with you on several items.

#1  I will be back to you by Wednesday with a 'Tweet/Facebook/Social Media Plan' for the ladies with regard to the Kardashian Prepaid MasterCard - for their review and approval.

#2  Training - we would like to set a meeting with Kourtney, Kim and Khloe to spend some time with them reviewing the card features and benefits and discussing how they will promote and respond to questions, conduct interviews, etc.  We want them to be well informed, with a sound reason to endorse this kind of product, etc.  We realize Kourtney and Kim are spending the next couple of months in NYC, however, I assume they will return to the West Coast for a day or two here and there, and Khloe will be in LA at times as well.  We can meet with each one of them separately, or just when we can catch them!  No problem.  And, we will absolutely have prepared material for them to review/study in preparation of the launch in NYC.

#3  Kardashian Prepaid MasterCard Launch Event - the venue was finalized.  It is Tuesday, November 9, 2010 at PACHA NYC.  Everyone is very excited and we are using the Santa Monica PR firm as well as YES PR to assist with the promotion of this important launch event.  Note: All travel arrangements are being addressed early this week!

#4  NYC Launch Event - I received a few guest names for invitation for Khloe, but nothing further.  I still need guest lists from Kourtney and Kim and Kris/Bruce, etc.  I want to invite anyone they would like, especially those already located in/near the NYC area.  It is important that I receive very soon.

#5  Following the launch event in NYC, we want to book the ladies at FOXWOODS RESORT CASINO in early December 2010.  We need to obtain any possible dates in December to hold this Kardashian Prepaid MasterCard event.  We would prefer to have all three ladies present, so please provide those dates first.  Then, if any two ladies could appear together, etc.

#6  We are still wondering about Khloe's availability for New Year's Eve.  I asked about this previously, but never received an answer.  Please let me know.

Thank you Lisa for all your help.  I look forward to receiving responses to all questions ASAP, these are time sensitive issues.

Nancy

**Nancy Torosian**
**Chief Operating Officer**
**Mobile Resource Card**
**559.285.9375**

# Exhibit C

# EXHIBIT "D"

Exhibit C

From: "Nancy Torosian" <nancy@mobileresourcecard.com>
To: "Kris Kardashian" <teneventz@aol.com>
Sent: Friday, October 22, 2010 1:15:51 PM
Subject: Kardashian Prepaid MasterCard Program

Hi Eve,

Please confirm that Kourtney, Kim and Khloe all received the Kardashian Prepaid MasterCard overview presentation of their card program. If they take the presentation thoroughly a few times, they will obtain a preliminary understanding of the features and benefits. I realize this is foreign to them, and it really requires time to get acquainted, but I want them to be as prepared as possible until they actually have a card in their hands.

Since it is widely known that the Kardashians have a friendship with Russell Simmons, I also want them to be prepared to answer any questions that may arise in possibly comparing their MasterCard program, with that of the Visa Rush Card. They should go online and just review the Rush Card program, and I have provided comments by Mary Rice written April 30, 2010 of Personal Money Store - MONEYBLOG. The bottom line is this, the Rush Card carries very high fees, and can end up costing the cardholder a lot of money each month. I will provide you with the Kardashian program fee schedule, so that all can see how very low the fees are, especially in comparison to the Russell Simmons Rush Card. They charge a fee of $.50 to $1.00 each time the card is swiped at a point of sale terminal, which is truly unbelievable, no one does that. The Kardashian program ATM fee is a mere $1.50, which is extremely low in the marketplace of fees up to $4.00 and double that in a casino.

**IMPORTANT:** This email is not written to slam Russell Simmons or his card program. It is to prepare Kourtney, Kim and Khloe in the event they are asked how their MasterCard program compares to their friend's Russell Simmons' Rush Card. They can simply state something like, "We are very excited to bring this card to our fans, and provide them with innovative features not available with other cards. And, we are proud to state that the monthly fee of ($7.95) is very low, lower than most bank accounts, and that all the other program related fees have been kept low to accommodate the needs of our cardholders! They can take the high road and share the great details about their program and let the reporter compare the two programs.

I can provide any other details requested by the Kardashians in preparing them for the media coverage associated with the card launch.

Thank you.

Nancy Torosian
559.285.9375

## High costs of the Rush Card

The Rush Card, however, does not work like a standard checking or debit account. Depending on which of the two types of Rush Card a customer gets, the fees can be very high. Activation and monthly fees can run as high as $19.95. There are fees for ATM balance inquiries and withdrawals. There are statement and "maintenance fees." There is a fee for paying bills with the Rush Card. The highest cost fee, however, can be the "convenience fee." This convenience fee charges between 50 cents and $1 each time your Rush Card is swiped or used to make a purchase. Long story short, the Rush Card could cost you $100 a month or more — to access your own money.

Exhibit C

# EXHIBIT "E"

Exhibit C

**From:** "Fritzo, Jill (NYC-ENT)" <Jill.Fritzo@pmkbnc.com>
**Date:** November 11, 2010 8:50:24 AM PST
**To:** "RICKMIRIGIAN@aol.com" <RICKMIRIGIAN@aol.com>, "nancy@mobileresourcecard.com" <nancy@mobileresourcecard.com>
**Cc:** "Keshishian, Noelle (LAN-ENT)" <Noelle.Keshishian@pmkbnc.com>, "Kris Jenner " <kris@kardashianjenner.com>
**Subject: RE: Kardashian Prepaid MasterCard - IMPORTANT!**

Hi, I will pass this along to kim...thanks.

In a message dated 11/11/2010 8:43:21 A.M. Pacific Standard Time, nancy@mobileresourcecard.com writes:

Hi Jill,

Just a quick note. I am aware that Kim Kardashian has an appearance on The Jay Leno Show tonight. Please be so kind to clarify the following with Kim prior to that appearance:

The Kardashian Prepaid MasterCard is a PREPAID DEBIT card ---- NOT A CREDIT CARD. (I know these terms are easily confused, but please ask that the term prepaid debit card be used at all times).

The Kardashian Kard is being marketed to individuals 18 years and older, and a companion card is available for those 16 years and older. THIS IS NOT A KIDS CARD. It is for consumers of any age 18 years and older.

The Kardashian Kard has a technology platform that is different than other cards in the marketplace -- so there is much more being offered to the cardholder than what other prepaid or traditional bank cards offer.

The Fee Schedule is very clear. To obtain the card, the fee is $59.95 for 6 months or $99.95 for 12 months. Both cards come loaded with $5.00! So, once the card is purchased, there are no other monthly fee paid until the 6 months or 12 months expires. At that time the monthly fee of $7.95 applies. $7.95 is a very reasonable fee, especially when you compare it to check account fees.

The Kardashians are not poor managers of funds. They have built a financial empire by being intelligent, great business women. Their high end purchases are well within their budget.

The Kardashian fan base is excited to now be offered with a great financial tool, please refer to the features and benefits of the Kardashian Kard. There are MANY benefits and features to the Kardashian Kard.

Lastly, I hope there is no mention of the November 9th launch. If so, Kim and others need to be prepared to respond that with all celebrities print/press is always spun negatively and that is just part of being a high profile person (persons) --obviously, you understand what to say.

THANK YOU! Please, please make sure Kourtney, Kim and Khloe receive this reminder -- especially Kim prior to her appearance on The Jay Leno Show. I really appreciate your assistance Jill! Call me with any questions! 559.285.9375

Nancy Torosian
Chief Operating Officer
Mobile Resource Card
www.mobileresourcecard.com
559.285.9375

Exhibit C

# EXHIBIT "F"

Exhibit C

## KARDASHIAN PREPAID MASTERCARD

### Program Pricing Options

**Six (6) Month Payment Option**           **$59.95**

6 Month Option includes the following:

| | |
|---|---|
| One-Time Card Purchase | $ 9.95 |
| 6 Monthly Fees of $7.95 | $47.70 |
| *Card Arrives Loaded with $5.00* | $ 5.00 |

Savings of $2.70


**Twelve (12) Month Payment Option**           **$99.95**

12 Month Option includes the following:

| | |
|---|---|
| One-Time Card Purchase | $ 9.95 |
| 12 Monthly Fees of $7.95 | $95.40 |
| *Card Arrives Loaded with $5.00* | $ 5.00 |

Savings of $10.40

*After the initial term of the program selected expires (6 or 12 month option), the standard monthly fee of $7.95 will apply.*

Exhibit C

| KARDASHIAN KARD Feature/Item Description | | Cardholder Fees |
|---|---|---|
| **Standard Fixed Fees** | | |
| Card Purchase (Includes monthly fees for 6 Month) | $ | 59.95 |
| Card Purchase (Includes monthly fees for 12 Month) | $ | 99.95 |
| Monthly Fee (Applies after initial puchase period) | $ | 7.95 |
| Replacement Card | $ | 9.95 |
| | | |
| **Free Services** | | |
| Activation | | FREE |
| POS-Signature-Domestic | | FREE |
| POS-PIN Based-Domestic | | FREE |
| POS-Signature-International | | FREE |
| POS-PIN Based-International | | FREE |
| Transfer funds between Internal accounts | | FREE |
| Direct Deposit-Employer/Government Benefits | | FREE |
| Account Inactive | | FREE |
| **Fee Based Services - Voluntary** | | |
| ATM Withdrawal-Domestic | $ | 1.50 |
| ATM Inquiry or Decline | $ | 1.00 |
| ATM Withdrawal-International | $ | 2.50 |
| ATM Inquiry or Decline | $ | 2.00 |
| POS-Decline-Domestic | $ | 1.00 |
| POS-Decline-International | $ | 1.00 |
| External checking or savings transfer (To or From) | $ | 1.00 |
| *Account to Account Transfer | $ | 1.00 |
| Retail load fee (MoneyGram) | $ | 1.00 |
| Load account by debit/credit card (2.5% surcharge) | $ | 1.00 |
| Cancel Account-Request balance mailed by check | $ | 6.00 |
| Service Center Care-Live Operator | $ | 1.50 |
| Bill Pay-Per item | $ | 2.00 |
| Expediated card delivery | $ | 25.00 |
| *Service is for moving funds to another person | | |

Exhibit C

# EXHIBIT "G"

Exhibit C

Date: September 30, 2010

Send To:          **877 762-5330**

Attention:        **ATTN: Nancy Torosian**

Office Location:

From:             Kris Jenner's Office

Office Location:  Hidden Hills, CA

Phone Number:     (818) 346-1976

Total Pages Including Cover:

# Fax



Comments:

Exhibit C

**Event Date:   Tuesday • November 9, 2010**

## Event Agenda

The Kardashian Sisters (known as Kourtney Kardashian, Kim Kardashian, and Khloe Kardashian Odom) agree to appear for the Kardashian Sisters Prepaid MasterCard Program National Release Event, scheduled to be held in New York City on Tuesday • November 9, 2010.  Specific venue to be announced.

The Kardashian Sisters individually agree to the following:

a.  Attend the event for a minimum of three (3) hours.  The time frame shall be from 8:00 p.m. to 11:00 p.m.

b.  Engage in a "meet and greet" and take pictures with all relevant parties.

c.  Promote the event utilizing all mediums, such as print, television, official websites, etc. as well as on their social media outlets, including but not limited to their Facebook and Twitter pages.

d.  Submit expenses associated with the event for consideration and approval by The Revenue Resource Group, LLC dba Mobile Resource Card, prior to the event. (Forward to: nancy@mobileresourcecard.com).

Dated 9/29/10

Agreed to by:

Kris Kardashian Jenner

Exhibit C

# EXHIBIT "H"

Exhibit C

**From:** Dennis Roach [mailto:dennis@roachlaw.net]
**Sent:** Monday, November 29, 2010 8:53 AM
**To:** claude@mobileresourcecard.com; jim.conrad@sunrisebanks.com; nikki.foster@sunrisebanks.com
**Subject:** FW: Notice of Termination
**Importance:** High

PLEASE SEE ATTACHED LETTER.

Dennis A. Roach

Dennis A. Roach, A Professional Corporation
9200 Sunset Boulevard, Suite 525
Los Angeles, CA 90069
T (310) 859-1800
F (310) 652-8211

CONFIDENTIALITY NOTE:
The information contained in this e-mail message and any attachments is legally privileged and confidential information intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message or its attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone, fax, or email and delete the message. Thank you.

Circular 230 Disclosure: To assure compliance with Treasury Department rules governing tax practice, we inform you that any advice (including in any attachment) (1) was not written and is not intended to be used, and cannot be used, for the purpose of avoiding any federal tax penalty that may be imposed on the taxpayer, and (2) may not be used in connection with promoting, marketing or recommending to another person any transaction or matter addressed herein.
<Notice of Termination.pdf>

Exhibit C

LAW OFFICES

# DENNIS A. ROACH

A PROFESSIONAL CORPORATION

9200 SUNSET BOULEVARD, SUITE 525

LOS ANGELES, CALIFORNIA 90069

TELEPHONE (310) 859-1800   FAX (310) 652-8211

dennis@roachlaw.net

November 29, 2010

**VIA FEDEX AND EMAIL**

William Claude Butler
Manager
The Revenue Resource Group, LLC
5627 N. Figarden Dr., #101
Fresno, California 93722
*claude@mobileresourcecard.com*

Jim Conrad
President
University National Bank
200 University Avenue W.
St. Paul, Minnesota 55103
*jim.conrad@sunrisebanks.com*

Nikki Foster
Sunrise Community Banks
200 University Avenue W.
St. Paul, Minnesota 55103
*nikki.foster@sunrisebanks.com*

**Re:** **Notice of Termination by Dash Dolls, LLC of Celebrity Endorsement Agreement with The Revenue Resource Group LLC**

Dear Mr. Butler, Mr. Conrad and Ms. Foster:

I am legal counsel to Dash Dolls, LLC, which entered into the Celebrity Endorsement Agreement with The Revenue Resource Group, LLC ("RRG") dated June 16, 2010 (the "Agreement"). In the Agreement, Dash Dolls granted RRG a limited license to use the names, photographs, likenesses and endorsements of Kim, Khloe and Kourtney Kardashian (the "Property") in connection with the marketing and sale of MasterCard prepaid debit cards in the name of the Kardashians (the "Product").

Based upon RRG's presentation regarding the Product, it was Dash Dolls understanding that the Product conformed to all necessary laws, rules and regulations. The terms disclosed to Dash Dolls in no way suggested or implied that the Product might violate any law, rule or regulation. But almost as soon as the Product launched, the Connecticut Attorney General announced on "Black Friday" (November 26) that his office has opened an investigation into whether the Product violates Connecticut's laws designed to protect

Exhibit

William Claude Butler
November 29, 2010
Page 2

ethical, and perhaps legal, questions under Connecticut's consumer laws.  The new federal Dodd-Frank Act also prohibits 'abusive' financial products being sold to consumers."

The Kardashians have worked extremely long and hard to create a positive public persona that appeals to everyone, particularly young adults.  They have been successful in doing so because they are recognized as honest, ethical, and fun-loving individuals who are kind and caring to others.  Unfortunately, the negative spotlight turned on the Kardashians as a result of the Attorney General's comments and actions threatens everything for which they have worked.

**Accordingly, Dash Dolls hereby terminates the Agreement in its entirety, effective immediately.**  As a result, the grant of rights set forth in section 1 of the Agreement is no longer effective, and the right and license to use the Property in connection with the Product is terminated, effective immediately.  Thus, RRG and all persons and entities acting in concert with RRG, including without limitation, University National Bank, Sunrise Community Banks, Mobe, Inc., TransCard LLC, Mobile Resources Card, and MasterCard must immediately stop utilizing the names, photographs, likenesses and endorsements of the Kardashians in connection with the marketing and sale of the Product or otherwise.  Under separate cover, Dash Dolls is returning to RRG the "Initial Deposit" paid to Dash Dolls pursuant to the Agreement.

This letter is not intended to and should not be construed as a complete statement of Dash Dolls' rights and remedies in connection with the Agreement, all of which are expressly reserved.

Sincerely,

Dennis A. Roach

DAR:td

Cc: Kris Jenner

Exhibit C